843 F.2d 1053
 Juanita V. SMITH, Widow of William F. Smith, Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Parke Coal Company,
and U.S. Fidelity & Guaranty Company, Respondents.
 No. 87-1805.
 United States Court of Appeals,
Seventh Circuit.
 Submitted Jan. 5, 1988.*
Decided April 11, 1988.
Rehearing Denied July 20, 1988.
 
 Stephen J. Peters, Stewart Irwin Gilliom Meyer & Guthrie, William J. Hamilton, Indianapolis, Ind., for petitioner.
 Daniel F. Hewins, Hewins & Hewins, Evansville, Ind., for respondents.
 Before CUDAHY, POSNER and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 This is a petition for review of an order of the Benefits Review Board of the United States Department of Labor (the "Board"). The Board reversed an award by an administrative law judge (the "ALJ") granting benefits to the petitioner[1] under the Black Lung Benefits Act, 30 U.S.C. Secs. 901 et seq. (the "Act"). The decision of the Board must be reversed.
 
 I.
 
 2
 We turn first to the decision of the ALJ. As determined by the ALJ, claimant Juanita V. Smith is the widow of William F. Smith. William Smith worked in various coal mines from 1941 to 1971. Smith last worked at respondent Parke Coal Company, from 1966 to 1971. He retired in 1971. On February 20, 1976, Smith died at the age of 62.
 
 
 3
 Based on these facts, claimant Smith was the beneficiary of a presumption that she was entitled to the payment of benefits under the Act. See 30 U.S.C. Sec. 921(c)(5).[2] To defeat entitlement to benefits, that presumption must be rebutted by a showing (1) that the miner did not suffer from pneumoconiosis;[3] or (2) that the miner was not totally or partially disabled; or (3) that any partial or total disability which the miner may have suffered was not due to pneumoconiosis. See id.; Bishop v. Peabody Coal Co., 690 F.2d 131, 134 (7th Cir.1982). Before the ALJ, Parke Coal attempted to rebut the presumption by a showing under alternative (3)--that any partial or total disability which the miner may have suffered was not due to pneumoconiosis. To this end, Parke Coal introduced the deposition of Kenneth Wilhelmus, M.D.
 
 
 4
 Dr. Wilhelmus examined only Smith's medical and employment records. He never examined Smith alive or dead. Dr. Wilhelmus acknowledged that Smith was disabled and that he had pneumoconiosis. According to Dr. Wilhelmus, however, Smith's disability was due to his heart problems, not pneumoconiosis:
 
 
 5
 After examining all of the protocol, I came to an opinion that Mr. Smith was ill, but his disability and illness was due to his heart and cardiovascular system, and no place in the record did I find any mention of pneumoconiosis, and various X-rays and reports of X-rays, histories, hospital summaries, both locally and at Indiana University, but except in one X-ray interpretation by Dr. Charles D. Smith, who is a qualified radiologist and a B reader,[4] and he stated that in his opinion the X-ray showed Q-type opacities, small, rounded, and profusion of 1/0 in all six zones of the chest. This profusion is the smallest possible and still have a diagnosis of pneumoconiosis. I do not, in my opinion, think that his disability or illness was due to pneumoconiosis, although it's on his chest X-ray film.
 
 
 6
 ....
 
 
 7
 In my opinion, the extent of the pneumoconiosis would not prevent him from doing his usual, customary job description at the above-ground coal mine where he worked. His disability was due to heart condition.
 
 
 8
 ....
 
 
 9
 I would be of the opinion that he would be asymptomatic had he had a normal heart and cardiovascular system because of the minuteness of the pneumoconiosis.
 
 
 10
 For three reasons, the ALJ discounted Dr. Wilhelmus' opinion and, thus, found that Parke Coal failed to rebut Juanita Smith's presumed entitlement to benefits. First, Dr. Wilhelmus had never examined the decedent, undertaking only a review of medical and employment records. Second, Dr. Wilhelmus did not know of Smith's history of breathing problems. Three witnesses, Juanita Smith, the decedent's son and a neighbor testified to Smith's respiratory problems: shortness of breath upon exertion, coughing spasms and sleeping difficulties.[5] All of these symptoms are consistent with pneumoconiosis. The ALJ, before whom the witnesses testified, found their accounts credible.
 
 
 11
 The third reason the ALJ discounted Dr. Wilhelmus' analysis was because that analysis was, in part, based upon incorrect facts. Questioned about Smith's respiratory problems, Dr. Wilhelmus responded, "He had respiratory problems from tobacco abuse." Dr. Wilhelmus stated that Smith's tobacco abuse consisted of smoking two to three packs of cigarettes per day for thirty years. Actually, according to the medical report Dr. Wilhelmus reviewed, Smith had smoked, variously, cigarettes, cigars, and pipes for thirty years.[6] Nowhere in the records reviewed by Dr. Wilhelmus is there an indication that Smith had smoked two or three packs of cigarettes per day. In fact, the records did not indicate the amount of tobacco Smith used daily. Confronted with this discrepancy, Dr. Wilhelmus stated, "I've just completed reviewing twelve other [miners' case] histories and one of them right before I read this had two or three packs. That's where I got that."
 
 
 12
 In conjunction with the Wilhelmus review, Parke Coal relied upon Smith's death certificate. That certificate listed the causes of death as cardiopulmonary arrest and myocardial infarction. The certificate did not mention pneumoconiosis. Having found the analysis of Dr. Wilhelmus flawed, the ALJ determined that Parke Coal, relying only on the death certificate, had not rebutted claimant Smith's statutory presumption.
 
 
 13
 We turn next to the decision of the Board. The Board reversed the ALJ, holding that the Wilhelmus deposition did rebut claimant Smith's presumption of entitlement to benefits. The Board disputed the ALJ's evaluation of the Wilhelmus deposition on three points. First, although acknowledging that an ALJ may accord less weight to a nonexamining physician, the Board determined that the ALJ did not give reasons for thus weighting the evidence. Second, the Board ruled that lay testimony alone is insufficient to outweigh otherwise uncontradicted and countervailing medical testimony in rebutting the statutory presumption. Third, while not specifically acknowledging Dr. Wilhelmus' error about Smith's smoking history, the Board noted that Dr. Wilhelmus found minimal problems in Smith's respiratory system.
 
 II.
 
 14
 Our review of these conflicting decisions focuses upon the determination of the ALJ:
 
 
 15
 It is whether the court of appeals believes that the administrative law judge's decision was supported by substantial evidence; if it was, then the Benefits Review Board's decision reversing the administrative law judge must itself be reversed, even if that decision could also be said to be supported by substantial evidence.
 
 
 16
 Old Ben Coal Co. v. Prewitt, 755 F.2d 588, 589 (7th Cir.1985) (citations omitted). While substantial evidence may support decisions both granting and denying benefits in the same case, see id.; Peabody Coal Co. v. Benefits Review Board, 560 F.2d 797, 802 (7th Cir.1977), this court has decided that the determinative decision is that of the ALJ, which must be supported by substantial evidence. See Prewitt, supra; Peabody Coal, supra; but see Prewitt, 755 F.2d at 593-94 (Cudahy, J., concurring in the result) (appellate court's primary review should be of the Board's decision).
 
 
 17
 Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The substantial evidence test is not as difficult to pass as a preponderance of the evidence burden. Peabody Coal, 560 F.2d at 802. Thus, a reviewing body may not set aside an inference merely because it finds the opposite conclusion more reasonable or because it questions the factual basis.[7] Id.
 
 
 18
 Central to this court's review is the role of the ALJ as factfinder. The "process of crediting and discrediting the evidence, and drawing inferences from the credited evidence, is properly within the fact finder's competence." Id. This is of particular importance where, as here, the evaluation of a medical opinion is in dispute. "The evaluation of the witnesses' credibility, including that of medical witnesses, is for the trier of fact. Moreover, the trier is not bound to accept the opinion or theory of any given medical officer, but may weigh the medical evidence and draw his own inferences." Id. (citations omitted). " 'We have long held that in black-lung cases the process of weighing conflicting medical evidence and drawing inferences therefrom properly lies within the authority of the ALJ.' " Arch Mineral Corp. v. Director, 798 F.2d 215, 221 (7th Cir.1986) (quoting Peabody Coal v. Director, 778 F.2d 358, 362 (7th Cir.1985)).
 
 
 19
 [T]he mere fact that an opinion is asserted to be based upon medical studies cannot by itself establish as a matter of law that it is documented and reasoned. Rather, that determination requires the factfinder to examine the validity of the reasoning of a medical opinion in light of the studies conducted and the objective indications upon which the medical opinion or conclusion is based.
 
 
 20
 Director v. Rowe, 710 F.2d 251, 255 (6th Cir.1983) (footnote omitted), cited in Peabody Coal v. Director, 778 F.2d at 363.
 
 
 21
 Under these standards, it is clear that the ALJ's decision was supported by substantial evidence. Beyond the presumption set out at section 921(c)(5), the ALJ was faced with x-ray evidence of pneumoconiosis. Consistent with these factors, the ALJ heard three witnesses who testified credibly and consistently about decedent Smith's coughing spasms, shortness of breath upon exertion and sleeping difficulties. In opposition, the ALJ considered the deposition of Dr. Wilhelmus and the death certificate of William Smith.[8] Dr. Wilhelmus did not have the opportunity to hear the testimony regarding Smith's breathing problems. Dr. Wilhelmus never examined Smith; and, in considering the breathing problems of which he was aware, Dr. Wilhelmus incorrectly attributed those problems to gross tobacco abuse. It was well within the ALJ's ambit as factfinder to discount the analysis of Dr. Wilhelmus.[9]
 
 
 22
 "[T]he ALJ considered all the relevant evidence, did not substitute his experience for that of a qualified physician and based his conclusions on credible evidence." Old Ben Coal Co. v. Luker, 826 F.2d 688, 692 (7th Cir.1987). His decision was supported by substantial evidence.
 
 
 23
 Having determined that the ALJ's decision was supported by substantial evidence, our review is complete.[10] See Prewitt, 755 F.2d at 592. The decision of the United States Department of Labor Benefits Review Board must be REVERSED and the petitioner-claimant paid benefits in accordance with the Act.
 
 
 24
 POSNER, Circuit Judge, dissenting.
 
 
 25
 The administrative law judge's opinion, granting benefits under the black-lung act to William Smith's widow, is illogical and scientifically ignorant; it is a travesty of factfinding. The administrative law judge played doctor, and played it badly. The only medical witness, Dr. Wilhelmus, testified that Smith had been disabled as a result of the heart disease that eventually killed him, not as a result of the mild black-lung disease shown on the only X-ray that provides any evidence of the disease. The administrative law judge rejected this testimony on three grounds. The first is that Wilhelmus never examined Smith. There is a good reason for this: Smith is dead. If a physician who had examined the living Smith had testified, his testimony might have been entitled to greater weight than Wilhelmus's; but none did. It is usually assumed that competent medical evidence on cause of death can be given by a physician who did not have an opportunity to examine the decedent when alive. The administrative law judge, who seems never to have heard of autopsies or pathologists, gave no reason for questioning that assumption in this case.
 
 
 26
 Second, the administrative law judge detected an error in Wilhelmus's testimony (which was given in the form of a deposition). Wilhelmus testified that Smith had been a two to three pack a day smoker, but all that the medical records show is that Smith had smoked cigarettes, cigars, and pipes for thirty years. This discrepancy was called to Wilhelmus's attention during his deposition, and he made clear that his opinion was unchanged. The only question therefore is whether that opinion was credible, once deprived of whatever support it had received from the mistaken assumption that Smith was a known heavy smoker (it is of course quite likely that he was a heavy smoker, but this was never established). Since Wilhelmus testified by deposition, the administrative law judge could not rationally have rejected the testimony by reason of Wilhelmus's demeanor. He could do so only if there was an objective reason to believe that the error about the precise amount of Smith's smoking was material to Wilhelmus's medical opinion. There was no reason to believe this.
 
 
 27
 Third, although aware that Smith had had breathing problems, Wilhelmus did not hear the testimony by Smith's family before the administrative law judge that Smith had difficulty breathing at night and when making the slightest exertion, and that he coughed.
 
 
 28
 Having gotten Wilhelmus's testimony out of the way, the administrative law judge combined the minimal X-ray evidence of black-lung disease with the family's testimony about Smith's breathing problems to infer that Smith had been totally disabled by black-lung disease.
 
 
 29
 Wilhelmus's testimony provided strong though of course not conclusive evidence that Smith's disability was due to heart disease rather than to black-lung disease, since the medical evidence indicated that if Smith had had black-lung disease at all it had been the mildest possible form of the disease. The fact that Smith had breathing problems (for the administrative law judge was entitled to believe the family's testimony) might seem consistent with his having a more serious case of black-lung disease than the medical evidence indicated; but if we pay careful attention to the actual symptoms to which the family testified, it becomes clear that they are symptoms of heart, not lung, disease. Respiratory distress upon exertion is a common symptom of early heart failure, and as the failure progresses the distress occurs even when the patient is at rest. Moreover, because a weak heart has difficulty preventing the accumulation of fluids in the lungs, and the difficulty is more acute at night when the patient is in a recumbent position, a person suffering from advanced heart failure is apt to have acute breathing difficulties and coughingat night--which is exactly what Smith's family testified to. The family corroborated a classic case of congestive heart failure, see Harrison's Principles of Internal Medicine 141-43, 908 (11th ed. 1987), and thus supported Dr. Wilhelmus's testimony.
 
 
 30
 The medical and lay evidence, viewed jointly as they should be, overwhelmingly demonstrate that Smith's disability was due to heart disease rather than black-lung disease (there is no argument that his heart disease may have been aggravated by black-lung disease). The action of the Benefits Review Board in reversing the administrative law judge was not only plausible; it was inevitable; and while we owe no special deference to the Board's views of the evidence, see Old Ben Coal Co. v. Prewitt, 755 F.2d 588, 589-90 (7th Cir.1985), we ought not disregard them when they make such excellent sense as they do here. Not only does the record establish that the employer carried its burden of proving that Smith was not totally disabled by black-lung disease, but the administrative law judge acted irrationally in refusing to credit Wilhelmus's evidence.
 
 
 31
 Corporations, even mining corporations, are entitled to equal justice under law, no less than widows. We should not allow sympathy for Smith's family to blind us to our duty, which is to affirm the Board.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the briefs and record
 
 
 [1]
 The Initial Determination of the United States Department of Labor was that benefits were due. After that determination, respondent Parke Coal Company sought review before the ALJ
 
 
 [2]
 The survivor of a deceased miner is presumed entitled to benefits "[i]n the case of a miner who dies on or before March 1, 1978, [and] who was employed for 25 years or more in one or more coal mines before June 30, 1971." 30 U.S.C. Sec. 921(c)(5). There is no dispute that the presumption applies here
 
 
 [3]
 Pneumoconiosis is "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. Sec. 902(b)
 
 
 [4]
 " 'B' readers are radiologists who have demonstrated their proficiency in assessing and classifying x-ray evidence of pneumoconiosis by successful completion of an examination conducted by or on behalf of the Department of Health & Human Services." Consolidation Coal Co. v. Chubb, 741 F.2d 968, 971 n. 2 (7th Cir.1984)
 
 
 [5]
 Dr. Wilhelmus stated that breathing difficulty upon exertion suggested pneumoconiosis; breathing difficulty while sedentary suggested chronic heart failure
 Before the ALJ, Smith's widow repeatedly testified concerning decedent Smith's breathing difficulties upon exertion:
 When he exerted himself, you could hear him panting or see him fighting for his breath. It started gradually and he would have difficulty in his breathing and then it would--you never knew when it was coming on but it seemed to be worse whenever he was doing something.
 Tr. 18. Mrs. Smith testified that the decedent experienced breathing problems when tilling the garden, mowing the lawn or working on the farm. Id. at 18-19. He was unable to use a hoe. Id. at 20. Mrs. Smith also testified that her husband lost consciousness upon exertion. Id. at 21. Significantly, when asked, "Did you ever hear him mention that he passed out when he was relaxing?" She answered, "Not to my knowledge." Id.
 Pat Smith, the decedent's son, also testified consistently about the decedent's breathing difficulties upon exertion. When asked, "What kind of things would cause this shortness of breath?" He answered:
 Anything--work in the garden, go to one end and he would have to stop and lean against the fence, rest before he could come back to the other end. Then when he come [sic] back, he would have to rest from being short of breath. He could work in the garage and he would be like changing the spark plugs on his truck or something and just get one side done and he would have to go and sit down or it may take him two or three days to get his truck waxed. Because he could just do so much and then he would have to quit.
 Id. at 40. When asked, "Would [your father's breathing problems] be just during the day or [would he] suddenly begin gasping for breath?" Pat Smith responded, "It would always follow some sort of exertion...." Id. at 44.
 Paul Heidenreich, Smith's neighbor, testified about Smith working with him on his farm. Heidenreich, too, consistently stated that Smith had difficulty breathing upon exertion:
 ATTORNEY BATES (for the claimant): Can you describe his breathing for us, as you remember it? Did he breathe normal [sic] like the rest of us?
 WITNESS HEIDENREICH: Well, unless he exerted himself. When he exerted himself, yes he had difficulty breathing.
 BATES: So, you didn't notice any problems he had with his breathing until he did something of effort?
 HEIDENREICH: That's right.
 BATES: And would that affect it, the more work he would do, have a stronger effect on his breathing?
 HEIDENREICH: Yes.
 Id. at 49.
 Both Mrs. Smith and Pat Smith testified that the decedent experienced labored breathing at night.
 Mrs. Smith testified that her husband coughed "rarely," but also stated that he coughed when he exerted himself. While he was still working at the mines, Smith would, according to Mrs. Smith, "cough up black stuff." Id. at 16. Upon blowing his nose, his handkerchief would contain black mucous.
 
 
 [6]
 The report also stated that Smith had not smoked at all from 1972 to 1976
 
 
 [7]
 Neither the Board, Prewitt, supra, nor this court, Peabody Coal, supra, may engage in de novo review of the ALJ's factual determinations
 
 
 [8]
 Of course, the death certificate standing alone could not rebut Juanita Smith's presumption. 20 C.F.R. Sec. 727.204(d)(4). The fact that the term "pneumoconiosis" is not mentioned in the death certificate is, in any case, of little import. A death certificate records only information about the immediate cause of death. See Arch Mineral, 798 F.2d at 222
 
 
 [9]
 As relied upon by Dr. Wilhelmus, there is extensive evidence that decedent Smith suffered from heart problems. This fact does not, however, defeat Smith's claim. " 'The concurrence of two sufficient disabling medical causes, one within the ambit of the Act, and the other not, will in no way prevent a miner from claiming benefits under the Act.' " Arch Mineral, 798 F.2d at 222 (quoting Peabody Coal Co. v. Director, 778 F.2d at 363 (citation omitted)). "Simply because the evidence in this case discusses in detail [Smith's] more imminently threatening heart disorder, it does not follow that the lung impairment would not have been disabling to some degree." Prewitt, 755 F.2d at 592 (Cudahy, J., concurring in the result)
 
 
 [10]
 We note briefly, however, the central flaw in the Board's rejection of the ALJ's determination. The Board rejected the extensive and consistent testimony of the three individual witnesses concerning Smith's breathing problems as "lay testimony alone." The ALJ's decision was not based on these witnesses' testimony alone. Decedent Smith's last x-ray was positive for the presence of pneumoconiosis. The key lay testimony, see supra note 5, unknown to Dr. Wilhelmus, rejected by the Board but accepted by the ALJ, demonstrated that Smith suffered not only from a disabling heart disorder but from a disabling lung impairment as well. The Board's wholesale rejection of this testimony also led the Board to conclude that Dr. Wilhelmus' error concerning Smith's tobacco use was of no importance. When Dr. Wilhelmus was asked whether or not Smith's smoking history would be important if testimony arose with respect to Smith's breathing problems, he replied "yes."