**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ADVANCE TRANSPORTATION COMPANY, Respondent.**

No. 91–1061.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 17, 1991.

Decided May 22, 1992.

Judith A. Dowd, N.L.R.B., Contempt Litigation Branch, Washington, D.C., Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Nancy B. Hunt (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., for petitioner.

Leonard R. Kofkin, Fagel & Haber, Chicago, Ill. (argued), for respondent.

Before BAUER, Chief Judge, CUDAHY and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

Advance Transportation Company ("Advance" or "the company") is an interstate and local trucking company headquartered in Milwaukee, Wisconsin, and which maintains forty terminals. Local Union No. 710, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO ("the union"), is the recognized collective bargaining representative for approximately 200 of the company's Bedford Park terminal employees. Advance employs two types of drivers at its Bedford Park terminal: about eighty seniority or regular drivers, and up to fifteen replacement drivers who fill in for absent regular drivers. The regular drivers are paid more than replacement drivers, and enjoy all the benefits of union representation, such as accrual of bargaining unit seniority and availability of a grievance procedure. Replacement drivers can become regular drivers but, under an agreement with the union, only on a seniority basis. As part of the company's compulsory profit-sharing program, it withholds twelve percent from the wages of both regular and replacement drivers. The profit-sharing program is the centerpiece around which the facts of this case revolve.

In April 1985, Advance offered a voluntary profit-sharing plan to all of its union-represented employees. The plan allowed the company to deduct twelve percent from employees' wages, ten percent of which it retained and the remaining two percent it used to purchase stock in the company for the participating employees. Daniel Tuffs, a regular driver for Advance since February 1979, was one of the employees who opted not to participate in this voluntary plan. Ten months after the plan was initiated, in February 1986, Advance's regional manager Thomas Horvath called Tuffs into his office to tell him that Advance wanted one hundred percent participation in the plan. Tuffs continued to decline, explaining that he could not afford to participate. Horvath responded that if Tuffs did not participate in the plan, there would be a layoff of employees and Tuffs would be at fault.

In late 1987, during negotiations between the company and the union for a three-year contract, the company proposed that its profit-sharing plan become compulsory for a five-year period. The union responded it would agree to this proposal only if a majority of the employees approved it in a special referendum. The company agreed, and a referendum was called. A few days before the vote, the company held an informational meeting for the Bedford Park employees. After Glen Carroll, the terminal's

operations manager, spoke in favor of the plan, Tuffs spoke up and called for a show of hands of those in favor of the plan. Only two employees indicated approval.

On the morning of December 18, 1987, the day of the referendum, Tuffs drafted, signed, and circulated a petition addressed to the union that indicated the objection of its signers to imposition of a compulsory profit-sharing plan by a simple majority vote. Including Tuffs, eighty-two employees signed the petition. Both Mike Zudycki, the terminal's office manager, and Horvath, the regional manager, saw Tuffs collecting signatures on the petition. In fact, Tuffs offered it to Zudycki, who responded that Tuffs should "get that thing away from me." The petition proved to be unnecessary, however, because the compulsory profit-sharing plan was defeated by a vote of 123 to 67.

The union and the company continued their contract negotiations with the company insisting that it needed a compulsory profit-sharing plan for its economic survival. It requested the union to join it in another referendum. The union declined, but countered that the employees might accept a compulsory plan if it were for only three years instead of five, and if it were accompanied by a pay increase greater than that required by the National Master Freight Agreement. The company agreed, and began campaigning among Advance employees for approval of the revised compulsory profit-sharing plan. The second referendum was held on February 25, 1988, and resulted in a majority of Advance employees approving the compulsory profit-sharing plan. Although the union refused to participate in this second referendum, it accepted the results and entered into the compulsory profit-sharing agreement for Advance employees as riders to the April 1, 1988, through March 31, 1991, collective bargaining agreements.

After the company and the union entered into the new contract, sixty Advance employees, Tuffs among them, filed grievances objecting to imposition of the compulsory profit-sharing plan. On April 27, 1988, the grievances were heard before a grievance board that included Advance's operations manager, Glen Carroll. Tuffs spoke out at the hearing, stating, "This is an example of what happens when you withhold monies from a person's check against their will and without their approval, and this thing will continue until people are given a voluntary choice on profit-sharing." Both the plan and employee dissatisfaction with it, however, continued. On April 14, 1988, two weeks after the plan was instituted, Advance hired Donovan Bauldry as a replacement driver. Bauldry added his voice to those unhappy with the compulsory plan, and would openly joke about it over the company radio.

The company distributed the first profit-sharing checks to employees on August 25. Tuffs's check was in the amount of $8.71. After receiving their checks, Tuffs and three others took them to Zudycki's office. Tuffs informed Zudycki of his pending, unresolved grievance. He insisted he was an unwilling participant in the program, and felt that if he accepted the check he would be indicating his approval of the plan. He therefore refused the check and placed it on Zudycki's desk. Zudycki responded that the check belonged to Tuffs, that the company wanted him to have it. Tuffs continued to refuse it and left Zudycki's office. The next day, Tuffs found the check in his box at the terminal where he received his messages and paychecks. Tuffs removed the check from his box and this time took it to Advance's regional manager, Thomas Horvath, reiterating what he said to Zudycki the day before. When Horvath told him the same thing Zudycki had, Tuffs left the check on Horvath's desk and walked out. Again, the next day, Tuffs found the check back in his box. This time he just left it there.

About two weeks after the profit-sharing checks were distributed, and Tuffs refused to accept his, dispatch manager Richard Blake called Bauldry into his office. Bauldry had accepted his profit-sharing check, but had not yet cashed it, awaiting a resolution of the grievance procedures. Blake informed Bauldry that he heard that Bauldry had made disparaging remarks about the company. Even though Bauldry denied

having done so, Blake cautioned him to stop making jokes and comments to other drivers about the profit-sharing plan. The company, Blake explained, needed the money from the plan to survive. He continued that the company was aware that other drivers were opposed to the plan, it knew who they were, and it would "get" them all eventually, that is, they would lose their jobs driving for Advance. Blake warned Bauldry not to get involved with those drivers, not to associate with them. He reassured Bauldry that he was aware he was a hard worker, that he even refrained from taking coffee breaks, and that Bauldry would be in the next group of replacement drivers who would receive regular driver status. He then finished by reminding Bauldry not even to say hello to the dissident drivers.

On Thursday, September 29, Tuffs received a note from Blake informing him that he was suspended from work on Friday for failure to follow instructions, and that a letter would follow. The company and the union's agreement permits the company to discharge any employee who violates the same rule three times within a six month period. One of those rules is that an employee must follow instructions. Blake explained to Tuffs on Friday morning that, after making a C.O.D. delivery, Tuffs failed to obtain a certified check as instructed, accepting a company check instead. This was Tuffs's second warning for failure to follow instructions since August 12, Blake reminded Tuffs. Blake told Tuffs he was suspended for that day, but should report back for work on Monday. Tuffs left.

On Saturday, however, Tuffs received a telegram from Zudycki informing him that his employment with Advance was terminated, effective immediately, noting a letter would follow. The telegram was dated September 30, the day before. On Monday, October 3, Tuffs called Zudycki for an explanation before a letter arrived. Zudycki told him that he was fired because he took his coffee break before his first delivery,

another violation of the rule that employees must follow instructions. The next day Tuffs received two letters from Blake. The first, dated September 30, was entitled "Second Warning Letter with One Day Suspension." This letter reminded Tuffs that he was issued a warning letter on August 12 for failure to follow instructions, and that on September 28 he again failed to follow instructions by stopping for a coffee break before making his first delivery of the day. The letter concluded that Tuffs was suspended from work for one day, Friday, September 30. The second letter Tuffs received from Blake was entitled "Letter of Termination," and was dated October 3. This letter detailed the three rules violations that lead to Tuffs's termination. These rules violations, the letter explained, were (1) the August 12 warning and a one day suspension for failure to follow instructions; (2) the September 30 warning and suspension for taking a coffee break on the 28th before his first stop, which is a failure to follow instructions; and (3) the third violation of that rule, also on September 28, by failing to obtain a certified check after making a C.O.D. delivery. The letter concluded that, in view of his failure to follow company rules, Tuffs's employment with Advance was terminated.

Throughout that fall Bauldry continued to receive assignments from Advance dispatchers. He received no assignments, however, after December 14, 1988, and on December 28 Blake sent him a letter informing him that Advance was discontinuing his service as a replacement driver as of that date.

Both Tuffs and Bauldry filed complaints against Advance with the National Labor Relations Board (the "Board" or "NLRB"). The complaints charge that Advance fired Tuffs and Bauldry for engaging in protected activity, in violation of Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3). The complaints [1] were consolidated for hearing

---

1. A third employee, Richard Kubat, also filed a complaint alleging the same violations of the Act. After the hearing the Administrative Law Judge concluded that Kubat's termination did not violate the Act. The National Labor Relations Board affirmed the ALJ's conclusion.

before an Administrative Law Judge ("ALJ"). In his Decision, the ALJ concluded that Tuffs's termination violated the Act, although Bauldry's did not. Both the company and the NLRB's General Counsel filed exceptions to the ALJ's Decision. On September 27, 1990, the Board issued its Decision and Order, which affirmed the ALJ's conclusion that Advance's termination of Tuffs violated the Act, but reversed his decision that its termination of Bauldry did not. Among other things, the Board ordered Advance to offer both Tuffs and Bauldry reinstatement. The Board now seeks enforcement of its Order. For the reasons that follow, the Order of the NLRB is enforced.

## I.

Under § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), an employer engages in an unfair labor practice if it interferes with, restrains or coerces employees who exercise their rights under § 7 of the Act. Section 7 protects employee involvement in concerted activities, most notably labor organizations. 29 U.S.C. § 157. Before the ALJ, the General Counsel claimed that Advance's motivation to terminate Tuffs and Bauldry was that they engaged in protected activities. Advance countered that its action in both cases was for good cause.

■■■ These conflicting claims brought this case within the parameters of *NLRB v. Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under *Wright Line*, the General Counsel carries the burden of showing by a preponderance of the evidence that the employer's action

was motivated in any way by a desire to impede protected concerted activity. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983). If he succeeds, the company then has the burden of showing, also by a preponderance, that it based its discharge decision on unprotected conduct as well, and that it would have fired the employee anyway. *Id.* at 400, 103 S.Ct. at 2473–74. Our task on review is simply to determine if the Board's findings and conclusions are supported on the record as a whole by substantial evidence, even if we could have concluded differently after a plenary review. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951).

■■■ As we recently noted, "substantial evidence may be less than a preponderance of the evidence, however, and 'a reviewing body may not set aside an inference merely because it finds the opposite conclusion more reasonable or because it questions the factual basis.'" *Freeman United Coal Mining Co. v. Stone*, 957 F.2d 360, 362 (7th Cir.1992) (quoting *Smith v. Director, OWCP*, 843 F.2d 1053, 1057 (7th Cir.1988)). The substantial evidence standard is the same even if the Board and the ALJ disagree, as they did concerning the termination of Bauldry. *Universal Camera*, 340 U.S. at 496, 71 S.Ct. at 468–69.[2]

Advance asserts that the ALJ misapplied *Wright Line* to impose upon it "an unattainable and impermissible burden to prove that Tuffs [sic] termination was absolutely sterile and without 'any' unlawful motivation...." Respondent's Brief at 11. The company claims further that this circuit "requires a greater burden of proof on the General Counsel than merely to show that

---

**2.** The company urges that the evidence supporting the Board's conclusion that Bauldry's discharge was unlawful should be viewed as "less than substantial," citing *NLRB v. Stor–Rite Metal Products, Inc.*, 856 F.2d 957, 964 (7th Cir. 1988) and *Stokely–Van Camp, Inc. v. NLRB*, 722 F.2d 1324, 1328–29 n. 8 (1983) because it is contrary to the ALJ's conclusion. The language to which the company refers indeed states that when the Board and the ALJ make inconsistent findings of fact and credibility determinations we are to view the Board's conclusion as less

than substantial. Here, however, contrary to Advance's reading of the Board's Order, the Board implicitly accepted all of the ALJ's credibility determinations, and found "no basis for reversing the [ALJ's] findings." NLRB Decision and Order ("D & O") at 1. Because the ALJ and the Board parted company only on their conclusions of law, *Stor–Rite and Stokely–Van Camp* do not apply. Therefore, we review the Board's conclusions of law for substantial evidence. *NLRB v. Joe B. Foods, Inc.*, 953 F.2d 287, 291 (7th Cir.1992).

some unlawful motivation 'in part' contributed to the result," citing generally *Northern Wire Corp. v. NLRB,* 887 F.2d 1313 (7th Cir.1989). These two contentions misstate both the record and the law. The ALJ correctly stated the requirements of *Wright Line,* see ALJ's Decision ("JD") at 19, lines 7-13, and correctly applied them to the facts in this case:

> The questions that remain are whether Respondent knew or suspected that Tuffs and Bauldry engaged in the protected, concerted activity of opposing the compulsory profit-sharing program, whether Respondent bore any animus toward such protected, concerted activity, whether any such animus was a motivating factor in the discharge of Tuffs and Bauldry, and whether Respondent has shown that, even in the absence of any such motivation, Tuffs and Bauldry would have been discharged.

*Id.* We see nothing in this language that required Advance to prove its termination of these two employees was completely aseptic, as Advance claims. We also see nothing in *Northern Wire Corp.*'s language to suggest that there is a greater burden on the General Counsel than to prove that Advance's action was motivated in some part by the employees' protected activities.[3] Nor is the company's burden any greater than to prove that, evidence of union animus notwithstanding, it would have fired these employees anyway. The Supreme Court recently has referred to these as balanced burdens, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45, 109 S.Ct. 1775, 1787-88, 104 L.Ed.2d 268 (1989), each equally weighted by a preponderance of the evidence. *Id.* at 258, 109 S.Ct. at 1794-95.

## II.

We start, then, by determining if there is substantial evidence to support the Board's conclusion that the General Counsel met his burden of showing by a preponderance of the evidence that Advance's decision to terminate Tuffs and Bauldry was motivated in any way by animus toward their protected activity. As the ALJ noted, this requires (1) evidence of the company's knowledge of that protected activity; (2) evidence of animus toward that activity; and (3) evidence that the company was motivated by that animus.

The record discloses that at the time the profit-sharing plan was voluntary the company was aware Tuffs refused to participate in it. Indeed, regional manager Horvath informed Tuffs that the company wanted one hundred percent participation in the plan, and if he refused and a layoff resulted Tuffs would be responsible. The company also was aware of Tuffs's activities in opposition to a compulsory plan. At a meeting in which operations manager Carroll was present Tuffs spoke against the plan and asked for a show of hands of employees who favored it. On the day of the vote, Tuffs prepared, signed, and circulated a petition expressing the opposition of its signators. Among those to whom Tuffs presented the petition for signature was company manager Zudycki, who responded hostilely. Although the first referendum failed, after the plan was approved in a second referendum, Tuffs and several other employees filed grievances. During the grievance hearing attended by Carroll, Tuffs informed Carroll that employee opposition would continue. When the plan became effective, Tuffs refused to accept the profit-sharing distribution check, repeated-

---

**3.** Advance misstated *Wright Line*'s requirements, as well as *Northern Wire*'s. It argues that the "General Counsel must make a showing that protected conduct was a *substantial motivating* factor" in its termination decision. Respondent's Brief at 18 (emphasis ours). *Wright Line,* as approved in *Transportation Management,* requires the General Counsel to show that protected activity was a substantial *or a* motivating factor. *Transportation Management,* 462 U.S. at 400 & 401, 103 S.Ct. at 2473-74 & 2474. Omission of the disjunctive "or", we will as-sume, was a scrivener's error and not a deliberate attempt to mislead us. Likewise, we assume Advance's counsel also did not deliberately attempt to mislead when, at oral argument, he stated that, "The Board recognizes that this court has held that there are a number of criteria that you look at to see whether or not the termination was unlawfully or illegitimately motivated, *substantially illegitimately motivated.*" Tape of Oral Argument (emphasis counsel's).

ly tried to return it, and ultimately left it in his message box at the terminal. Approximately two weeks after these events, dispatch manager Blake instructed Bauldry to stop making jokes about the plan and to disassociate himself from employees who opposed it. Further, Blake informed Bauldry that the company knew the identities of the dissidents and would fire them. Clearly, then, the body of evidence to establish the company's knowledge of the employees protected activity is substantial.

Much of the evidence recited above establishes animus as well as knowledge, including Horvath's statement to Tuffs suggesting he would be responsible for a layoff if he failed to participate in the voluntary plan. The ALJ concluded that the clearest evidence of animus was Blake's statements to Bauldry that the company knew who opposed the compulsory plan and would terminate their employment, and that although Blake was a hard worker, continued association with those employees would jeopardize to his advancement to regular driver status. These facts establish animus.

The ALJ found, and we have no reason to dispute, that the company believed the compulsory plan was necessary for its economic survival. That is strong circumstantial evidence of the company's motive to discharge employees who opposed the plan. As we have said, "The Board is 'free to rely on circumstantial as well as direct evidence' in assessing motive." *NLRB v. Jakel Motors, Inc.*, 875 F.2d 644, 646 (7th Cir.1989) (quoting *NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1266, 1267, 1267–68 (7th Cir.1987)). Moreover, Blake's statement to Bauldry that the company knew who the employees were who opposed the plan and that they would be fired is direct evidence of motive. We conclude, therefore, as did the ALJ and the Board, that the General Counsel met his *Wright Line* burden of proving that Advance's action to terminate Tuffs and Bauldry was motivated in part by their protected activity.

## III.

We now must determine whether the company met its burden of proving by a preponderance of the evidence that it would have discharged Tuffs and Bauldry notwithstanding their protected activities. To that end, we review in turn the evidence regarding each employee's discharge.

### A. Daniel Tuffs

■ Advance claims that it discharged Tuffs solely for violating its union-approved, three-strike disciplinary policy. There is no dispute concerning Tuffs's first strike, a warning and one-day suspension for failure to follow orders on August 12, 1988. Nor is there any dispute about the other two, that Tuffs failed to collect a cashier's check for a C.O.D. delivery on September 28 and that he took a coffee break before his first morning delivery on September 29. The dispute centers on the significance of which of these two latter violations constituted the third, and whether the rule prohibiting coffee breaks before first deliveries was enforced consistently as to all employees, or, as the ALJ concluded, used as a pretext to fire Tuffs.

Recall that on Thursday, September 29, Tuffs received a note informing him he was suspended from work on the following day. On Friday Tuffs went to the office to find out why. Blake told him it was for the cashier's check violation. On Saturday, October 1, Tuffs received a telegram dated September 30 informing him he was terminated, and that a letter would follow. On Monday, October 3, Tuffs called the office manager, Zudycki, to find out why. Zudycki told him it was because of his violation of the coffee break rule. Then, on Tuesday, the 4th, Tuffs received two letters from Blake. The first, dated September 30, served as notice of his second violation for breaking the coffee break rule. The second letter, dated October 3, served as notice of termination for his third violation for not collecting a cashier's check.

The ALJ concluded that the manner in which these events unfolded indicated that after Tuffs left on the 30th Blake went in search of a third, colorable violation to

support Tuffs's discharge. His search was successful—he discovered Tuffs's coffee break violation. Suspecting that a violation uncovered after an unlawfully motivated search would not support a discharge, however, Blake revised history to reflect that Tuffs's coffee break violation was his second and his cashier's check violation was his third. Advance argues that the ALJ's summary of the facts surrounding Tuffs's discharge and the conclusion he drew from those facts indicates the ALJ was consumed by an issue of no consequence. On the contrary. The ALJ's interpretation of events is entirely consonant with a company that, as Blake told Bauldry, knew which of its employees was opposed to its profit-sharing plan and intended to get rid of them.

Regardless of the conditions under which Tuffs's coffee break violation was discovered, or its numerical position in a sequence of three violations, the ALJ concluded that Advance's use of that violation to terminate Tuffs was "the epitome of discriminatory action...." JD at 23. He based this conclusion on evidence that showed Tuffs was singled out for a warning, leading to discharge, for a coffee break violation while other drivers customarily were treated with verbal reminders of the company's policy and, even then, only after repeated violations. Critical to the ALJ's conclusion were Tuffs's trip sheets for the sixty days preceding his discharge. Those sheets disclose that on fifty-four out of sixty days Tuffs stopped for coffee before his first morning delivery. Blake testified that he reviewed each driver's trip sheets on a daily basis. Consequently, the company was aware of Tuffs's repeated violation of the rule, but took no disciplinary action until it could use that violation to discharge Tuffs.

The company's rule allows drivers to stop for coffee before their first morning delivery if they obtain permission from the dispatcher first, but Advance offered no evidence that Tuffs in fact received permission on those fifty-four other occasions. The company argues to us that it is entitled to the assumption that Blake believed Tuffs called for permission all those other times and on the one occasion he did not, he received a warning notice. The company misses a fundamental precept in the adversarial process. The party who advances a position bears the burden of producing evidence to support that position. 9 WIGMORE, EVIDENCE § 2486 (Chadbourn rev. 1981). Advance did not. So the record, as it stands before us, contains sixty trip sheets showing Tuffs took a coffee break fifty-four times before making his first morning delivery. There is nothing in the record to show Tuffs received permission on those fifty-four occasions, and we will not "dabble in factfinding." *NLRB v. Joe B. Foods, Inc.*, 953 F.2d 287, 291 (7th Cir.1992).

As to how the company treated other coffee break rule violators, Blake testified that when he reviewed all the drivers' trip sheets, if he saw repeated violations among several drivers he would call a meeting and remind all the drivers of the rule, or slip them a note in their message box. JD at 22 n. 17. In an attempt to show even-handed discipline regarding the coffee break rule, the company points to warning, suspension, and termination letters it issued to drivers for a five-year period preceding Tuffs's termination. For the most part, however, those letters deal with violations other than taking an unauthorized coffee break, such as taking extended coffee breaks. Only one other driver was fired for conduct that included an unauthorized coffee break, and that was in March 1983. The parties stipulated that between 1987 and 1989, other than Tuffs, no other driver received a warning for taking an unauthorized coffee break. Blake himself admitted he never issued a written warning for any other driver for coffee break violations.

All of the facts recited above provide substantial evidence to support the ALJ's conclusion that Advance failed to meet its burden to show it would have fired Tuffs regardless of his protected activity. It is clear that Advance was looking for a reason to fire him because of his conduct in opposition to the profit-sharing plan. The company seized upon the discovery of two valid violations of company rules in an attempt to camouflage its selective enforce-

ment of the coffee break rule and use all three violations to support Tuffs's discharge. In so doing, however, as the ALJ correctly concluded and the Board agreed, the company violated § 8(a)(1) of the National Labor Relations Act.

## B. Donovan Bauldry

 Advance hired Bauldry as a replacement driver several weeks after the compulsory profit-sharing plan became effective. As a replacement driver, Bauldry understood that he would work only as needed by the company to fill in for absent regular drivers, and that he could become a regular driver only after the company filled whatever vacancies arose for regular drivers with replacement drivers more senior than he. For this reason, the company argues, "Bauldry's employment relationship was tenuous from the beginning." Respondent's Brief at 33. Yet, the ALJ found that when Zudycki hired Bauldry, he gave Bauldry the impression that he could work for Advance indefinitely, although not through the slow Christmas season. Indeed, Bauldry drove for Advance steadily until December 14. On December 31, however, he received a letter informing him that Advance was terminating him as a replacement driver.

The company's dispatch manager, Blake, testified that Bauldry was terminated solely because his job performance had declined. The ALJ based his conclusion that Advance's termination of Bauldry was not unlawful on the General Counsel's failure to rebut that testimony. The Board, however, found "Blake's conclusional testimony to be too slender a reed to support a *Wright Line* defense, given other testimony that the judge has credited." D & O at 3. Advance argues to us that by reversing the ALJ the Board effectively required it to show by clear and convincing evidence, rather than by a preponderance of the evidence, that it would have discharged Bauldry in any event. The company suggests that the Court's most recent statement regarding the quantum of evidence an employer must offer in order effectively to meet its *Wright Line* burden appears in Justice White's concurrence in *Price Wa-*

*terhouse.* Justice White wrote "where the legitimate motive found would have been ample grounds for the action taken, and the employer credibly testifies that the action would have been taken for the legitimate reasons alone, this should be ample proof." *Price Waterhouse,* 490 U.S. at 261, 109 S.Ct. at 1796 (White, J., concurring).

Assuming Justice White's statement to be correct, its linchpin is that the employer's testimony must be credible. The flaw in Advance's argument is that both the ALJ and the Board discredited the employer's testimony. Bauldry testified that in September 1988 Blake called him into the office to warn him about "saying bad things about the company." JD at 15. In that meeting, Bauldry continued, Blake acknowledged that Bauldry was a good worker who "worked [his] ass off" for the company, even foregoing coffee breaks, and he was in the group of replacement drivers who would next attain regular driver status. *Id.* In contrast, Blake testified that in that meeting he did not discuss the profit-sharing plan with Bauldry, but instead told him that if he improved his performance, stopped being lazy, he had a good chance to become a permanent driver. *Id.* at 17. When asked why Bauldry was discharged, Blake responded that Bauldry's productivity, as reflected in his work records from July through December, was unacceptably low. *Id.* at 18.

As the Board noted, Blake's "assertion that Bauldry's work performance had deteriorated is belied by two aspects of the record." D & O at 3. First, in his findings, the ALJ stated, "I discredit Blake in some, but not all, of his denials of Bauldry's testimony." JD at 18. The only denial the ALJ specifically discussed in his findings was Blake's denial that he threatened that employees opposed to the profit-sharing plan would be discharged. In his analysis and conclusions, however, the ALJ specifically credited Bauldry's testimony that Blake told him he was a good worker. By implication, as the Board concluded, the ALJ discredited Blake's testimony that he spoke to Bauldry in September about a

decline in his work performance. Indeed, the credited testimony was that Blake praised Bauldry's work performance.

Second, Blake testified that he based his decision to terminate Bauldry on Bauldry's "work cards," which he claimed showed a decrease in performance over the period from July to December. The company, however, failed to offer these records in support of its position. As the Board correctly noted, the company's failure to produce the cards "leads to an inference that the cards would not have buttressed [Advance]'s position or indeed would have undercut it." D & O at 3. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 174, 94 S.Ct. 414, 420, 38 L.Ed.2d 388 (1973). *See also P.R. Mallory Co. v. NLRB*, 400 F.2d 956, 959 (7th Cir.1968), *cert. denied*, 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969) ("[F]ailure to produce evidence, which under the circumstances would be expected, gives rise to a presumption against the party failing to produce it.").

We conclude, as did the Board, that the ALJ based his decision regarding Bauldry on an incorrect legal conclusion. Advance failed to show by a preponderance of the evidence that it would have discharged Bauldry regardless of his participation in protected activity. For that reason, the burden never shifted back to the General Counsel. Thus, contrary to the ALJ's conclusion, he was not required to rebut the evidence offered by the company. The General Counsel met his *Wright Line* burden, while the company did not.

For these reasons, the order of the National Labor Relations Board is

ENFORCED.