**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ADVANCE TRANSPORTATION COMPANY, Respondent.**

**No. 91–1103.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1991.

Decided Nov. 10, 1992.

Judith A. Dowd, John Fawley (argued), N.L.R.B., Contempt Litigation Branch, Washington, D.C., Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Aileen A. Armstrong, N.L.R.B., Appellate Court, Enforcement Litigation, Paul J. Spielberg, N.L.R.B., Litigation Branch, Washington, D.C., for plaintiff N.L.R.B.

Leonard R. Kofkin, Fagel & Haber, Chicago, Ill., for respondent Advance Transp. Co.

Before WOOD, Jr. and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

## I. INTRODUCTION

Section 8(a) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a), makes it unlawful for an employer to discharge an employee because of his participation in protected union activities. In the present case, the Administrative Law Judge (ALJ) found that Advance Transportation Company, an interstate and local trucking company, violated sections 8(a)(1), (3) and (4) of the Act, 29 U.S.C. § 158(a)(1), (3) and (4), when it terminated truck driver Harry Bidwell, and ordered, among other

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

things, that Advance offer Bidwell reinstatement. The National Labor Relations Board (the "Board" or "NLRB") affirmed the ALJ's findings and conclusions and adopted the recommended order. It now seeks enforcement of that order.

## II. BACKGROUND

This is not the first time Advance Transportation has been found in violation of the Act. In the latter half of 1988, Advance terminated two other truck drivers, Daniel Tuffs and Donovan Bauldry, for allegedly violating its "three strike" disciplinary policy.[1] Both Tuffs and Bauldry filed complaints against Advance with the NLRB contending that their termination was in violation of the Act, more specifically that they were terminated for openly opposing a compulsory profit-sharing plan proposed by the company and for associating with other union members who opposed the plan. The Board found that antiunion animus was indeed a motivating factor in the termination of Tuffs and Bauldry in violation of 29 U.S.C. § 158(a)(1) and (3), and that Advance failed to show that it would have fired them absent the discriminatory motive. As part of its remedy, the Board ordered Advance to offer both drivers reinstatement. We granted enforcement of that order in *NLRB v. Advance Transportation Co.*, 965 F.2d 186 (7th Cir.1992).

The facts surrounding Bidwell's termination are inextricably intertwined with those in Tuffs' and Bauldry's case. Like Tuffs and Bauldry, Bidwell openly opposed the compulsory profit-sharing plan proposed and ultimately implemented by Advance. Indeed, Bidwell ran for union office on a platform which targeted the compulsory plan. When the Tuffs and Bauldry case was heard by the Board, Bidwell was subpoenaed as a witness on behalf of the grievants to testify at the hearing. It is his absence from work on the second day of that hearing which ultimately resulted in his own termination.

Bidwell testified that he was subpoenaed to appear before the Board on April 24, 1989 and that, pursuant to the company's call-in policy, he telephoned Advance Transportation that morning to advise the dispatch office that he would be absent. Bidwell indicated that he had spoken with John Harper on that morning and advised him that he had been subpoenaed by the Board, and that he had been informed that the hearing would probably last more than one day. According to Bidwell, Harper stated, "That sounds like personal business to me," and abruptly hung up. Harper, however, testified that Bidwell called in sick that morning, and made no mention of his potential absence on April 25.

Bidwell testified that he made several unsuccessful attempts to call Advance on the morning of April 25 to verify his presence at the hearing and to notify the company of his absence. On all but one occasion there was no answer in the dispatch office. When Bidwell finally did get through, he was put on hold by a man whose voice he did not recognize. After waiting several minutes, Bidwell hung up. He made no further attempt to contact the company that day. William Close, in charge of labor relations and personnel at Advance, testified that Bidwell was accordingly listed as a "no call, no show" on the absentee report for April 25.

That Bidwell was actually at the Board hearing on April 25 is undisputed, as were Tuffs, Bauldry, Richard Blake, the dispatch manager, and Thomas Horvath, the regional manager. Blake testified, however, that he neither saw Bidwell nor had any knowledge of his presence at the hearing on that day. He testified that when he returned to the dispatch office late Tuesday afternoon on April 25 after the hearing had been completed, he learned that Bidwell had been listed as a "no call, no show" for that day.

Shortly after arriving at the terminal on Wednesday morning, April 26, Blake in-

---

**1.** Pursuant to the agreement reached between the union and the company, the company may discharge an employee for violating the same rule three times. The company's disciplinary policy is progressive, and provides for a warning letter on the first violation, a warning and suspension for the second violation, and discharge for the third violation.

structed Bidwell to see William Close regarding his absence the previous day. When Close questioned Bidwell regarding his absence on April 24 and 25 and indicated that Bidwell had called in sick on the 24th, Bidwell stated that he had been at the Board hearing on both days, that he had called in on April 24 to advise the company of his whereabouts, and had attempted to call in on April 25 without success. At that point, Bidwell was excused and the union steward, George Leichd, was summoned. The meeting was subsequently reconvened in the office of the terminal manager, Thomas Harper, where Bidwell was advised that he was being suspended pending investigation for "failing to follow instructions."

The company's brief investigation was conducted by Close, who simply asked Blake and Horvath if they had seen Bidwell at the hearing on April 25. Although the record does not disclose what Horvath's response was, Blake stated that he had not seen Bidwell. Close also asked John Harper to verify the content of the note he took regarding Bidwell's call on April 24. To that end, Harper executed a verified statement prepared by the office manager, JoAnne Budnick, and dated April 26, 1989, which provided as follows:

> On Monday, April 24, 1989, I received a call from Mr. Bidwell at approximately 6:00 am. He told me he would be off Monday because he was sick. He also told me to inform Rich Blake in dispatch that *he would not be in Monday.*

(Emphasis original). By 11:00 a.m., the investigation had been completed, and the decision to terminate Bidwell had been made. The official notice of termination dated April 26, 1989 stated:

LETTER OF DISCHARGE

Mr. Bidwell:

On April 24, 1989, you called in to the Terminal advising that you were sick and would not be at work. You made no reference to your illness being extended beyond that day. On April 25, 1989, you failed to show up for work or call in. You have had previous warnings for failure to follow instructions. You were warned and suspended on October 21, 1988 for failure to follow instructions. On November 16, 1988, you were sent a warning letter for failure to follow instructions. On November 17, 1988, you were advised of a one day suspension for failure to follow instructions.

The above record indicates your lack of concern in following Company instructions and you leave us no alternative but to discharge you for the above offense, effective immediately.[2]

Although the letter was signed by Thomas Harper as terminal manager, William Close actually made the decision to terminate Bidwell's employment.

Advance contends that the evidence does not support the Board's determination that it violated § 8(a) by discharging Bidwell. It contends that antiunion animus was not shown to be a motivating factor in Bidwell's termination; that Bidwell was fired in accordance with a well-established progressive disciplinary policy; and that he would have been terminated notwithstanding any purported animus toward the union.

III.  STANDARD OF REVIEW

■ Although 29 U.S.C. § 160(e) provides for judicial review of the Board's

---

**2.** What constitutes a "failure to follow instructions" is unclear. It appears from the evidence presented in this case and the testimony provided in the Tuffs/Bauldry case that any offense, related or unrelated, can be reclassified as a failure to follow instructions if the company deems it appropriate to do so. For example, Bidwell's suspension in October 1988 was for tardiness. The warning and suspension in November 1988 were for failing to fill out a daily trip card on November 16 and for taking an unauthorized stop on that same date. It is also significant to note that although Close testified

that the company enforces its "three strike" policy "all of the time," it clearly did not do so in Bidwell's case. The record shows that Bidwell was absent from, or late for, work at least fourteen times between December 1, 1987 and August 1, 1988, and yet he received only three written warnings in that time. In each case, the offense was listed as either "tardiness" or "excessive absenteeism." Bidwell's first suspension for being late to work came in October 1988. The words "failure to follow instructions" were mentioned for the first time in the written notice of suspension.

decision, that review is limited. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964); *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314 (7th Cir.1991) (*en banc*), *cert. denied*, —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). The Board's factual findings, and its application of the law to particular facts, are conclusive and binding on this court if they are supported on the record as a whole by substantial evidence. 29 U.S.C. § 160(e); *NLRB v. So–White Freight Lines, Inc.*, 969 F.2d 401, 405 (7th Cir.1992); *U.S. Marine Corp.*, 944 F.2d at 1313–14; *Indianapolis Power & Light Co. v. NLRB*, 898 F.2d 524, 529 (7th Cir.1990). A reviewing court may not reweigh the evidence or "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

## IV. ANALYSIS

■ The initial burden in proving a violation of § 8(a) falls on the Board's General Counsel, *NLRB v. Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), who must prove by a preponderance of the evidence that the employer's action was motivated *in some part* by its desire to impede the employee's protected activities. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983); *Advance Transportation*, 965 F.2d at 190–91. If the employer is unable to rebut the General Counsel's *prima facie* showing, it can avoid being adjudicated a violator of the Act only if it can prove by a preponderance of the evidence that its actions were based on unprotected conduct as well, *and* that it would have taken the same action anyway. *Transportation Management*, 462 U.S. at 400–403, 103 S.Ct. at 2473–75; *Advance Transportation*, 965 F.2d at 190–91.

■ The ALJ found that the General Counsel had established a *prima facie* case

against Advance by showing by a preponderance of the evidence that Advance had knowledge of the protected union activity, that it exhibited animosity toward that activity, and that that antiunion animus was a motivating factor in the discharge decision. There is indeed substantial evidence in the record to support that conclusion.

■ Advance's arguments on appeal are premised on the mistaken belief that its witnesses were more credible than the petitioner's, and that the ALJ could not reasonably have found otherwise. The law is clear: Where there are two materially conflicting versions of the same incident, an ALJ's credibility determinations are entitled to deference. *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1477 (7th Cir. 1992). We will not overturn such determinations absent extraordinary circumstances, which include a clear showing of bias by the ALJ, utter disregard for uncontroverted sworn testimony or acceptance of testimony which on its face is incredible. *So–White Freight Lines*, 969 F.2d at 407; *Augusta Bakery*, 957 F.2d at 1477; *Stripco Sales, Inc. v. NLRB*, 934 F.2d 123, 125 (7th Cir.1991); *NLRB v. Illinois–American Water Co. Southern Div.*, 933 F.2d 1368, 1374 (7th Cir.1991); *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 687 (7th Cir.1982). Such circumstances are not present in this case. Advance's allegations of bias are conclusory and unsupported by the record. The mere fact that the ALJ credited the General Counsel's witnesses over those of Advance Transportation does not conclusively establish bias. *Berger Transfer & Storage*, 678 F.2d at 687. Advance alleges nothing more.

That Advance had knowledge of Bidwell's union activities and his opposition to the company's profit-sharing plan prior to April 24, 1989, and that it knew Bidwell was at the Board hearing on April 24 is generally undisputed. While Advance contends that Bidwell misrepresented the reason for his absence on April 24 and thus violated company policy regarding the use of sick leave, it did not use that violation as a basis for terminating Bidwell's employment. Instead, Advance seized upon Bidwell's absence on April 25 as an opportuni-

ty to discharge him, contending that it had no knowledge of his presence at the Board hearing on April 25, 1989.

The ALJ cited several reasons for rejecting the testimony of Advance's witnesses regarding the events of April 24 and 25, including, but not limited to, the demeanor of the witnesses, Advance's failure to undertake more than a perfunctory investigation of Bidwell's alleged misconduct, Advance's failure to call corroborating witnesses [3] or to produce credible corroborating documentary evidence,[4] and the general implausibility of Advance's version of the events. The ALJ found it incredible that Bidwell would have called in sick on April 24 when he knew that Blake and other management personnel would also be present at the hearing and that, pursuant to company policy, "proven false claims of illness or injuries [would] result in disciplinary action by the company." Advance's failure to follow its disciplinary policy not only lent credence to Bidwell's version of the events of April 24, but rendered suspect much of the testimony presented by Advance's witnesses.

While there were inconsistencies in Bidwell's testimony, his version of the events of April 24 and 25 was plausible. Bidwell testified that he had advised Harper on April 24 that he had been subpoenaed to testify at the Board hearing on that date and had been advised that the hearing was likely to last more than one day, and that he had attempted to call in on April 25 to confirm his presence at the Board hearing, but was unable to complete his call. Tuffs and Bauldry both testified that Bidwell was at the hearing on April 25 and that he attempted to call the office that morning.

That there is substantial evidence of antiunion animus is also clear from the record. As we stated in *Advance Transportation,* 965 F.2d at 192, "the clearest evidence of animus was Blake's statements to Bauldry that the company knew who opposed the compulsory plan and would terminate their employment, and that ... continued association with those employees would jeopardize his advancement to regular driver status." That antiunion animus was a motivating factor in Bidwell's discharge was evidenced by the timing of his discharge, the company's failure to thoroughly investigate the alleged misconduct, and its selective enforcement of its disciplinary policies. *See So–White Freight Lines,* 969 F.2d at 408; *NLRB v. O'Hare–Midway Limousine Service, Inc.,* 924 F.2d 692, 697 (7th Cir. 1991); *W.W. Grainger, Inc. v. NLRB,* 582 F.2d 1118, 1121 (7th Cir.1978); *NLRB v. Gogin,* 575 F.2d 596, 602 (7th Cir.1978).

█ Under the circumstances, Advance could avoid being adjudicated a violator of the Act only if it could prove by a preponderance of the evidence that Bidwell would have been discharged had he not been involved in protected union activities. The company does not meet its burden merely by showing that a legitimate reason may also have existed for the termination; instead, it must show that its legitimate reason, standing alone, would have induced it to discharge Bidwell. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 239–252, 109 S.Ct. 1775, 1784–92, 104 L.Ed.2d 268 (1989); *Advance Transportation,* 965 F.2d at 191– 195. The ALJ found that Advance failed to meet that burden. Substantial evidence in the record as a whole supports that conclusion. As the ALJ correctly noted, Advance's failure to produce material witness-

---

**3.** Advance called only one of the dispatchers on duty on April 24 and 25, although there were three on duty both days. Although both Richard Blake and Thomas Horvath were present at the hearing on April 25, only Blake testified as to who was, or wasn't, at the hearing that day.

**4.** Advance failed to produce any of the office records which could have corroborated Harper's testimony that Bidwell called in sick on April 24, i.e., the absentee report and absentee form for April 24, or Bidwell's time cards. The two documentary exhibits which were introduced by Advance were found to be of questionable authenticity. The first, an absentee form

purportedly signed by John Harper, shows that Bidwell's call was received at 6:50; however, Harper testified that he took the call at 6:30, and indicated in his verified statement dated April 26, 1989 that the time was 6:00 a.m. Although the form purports to contain the signature of "J. Harper," Mr. Harper testified that the signature was not his and that one of the other dispatchers, David Hoffner, must have filled out the reports that day and signed his name. Mr. Hoffner did not testify. The ALJ also questioned the circumstances surrounding Harper's execution of the verified statement of April 26.

es and credible documentary evidence gave rise to a presumption against it, *see Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 174, 94 S.Ct. 414, 420, 38 L.Ed.2d 388 (1973); *Advance Transportation,* 965 F.2d at 195; *P.R. Mallory Co. v. NLRB,* 400 F.2d 956, 959 (7th Cir.1968), *cert. denied,* 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969), as did its inconsistent application of its disciplinary policies, its failure to investigate, and its treatment of similarly situated employees such as Tuffs and Bauldry.

## V. CONCLUSION

The Board's factual findings are supported on the record as a whole by substantial evidence. Its application of the law to those facts is without error. Accordingly, the order of the National Labor Relations Board is

ENFORCED.