NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SO–WHITE FREIGHT LINES,
INC., Respondent.

No. 91–1697.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1991.
Decided July 23, 1992.

Paul J. Spielberg, Michael J. Gan (argued), N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Joseph A. Szabo, Director, N.L.R.B., Milwaukee, Wis., for petitioner.

Paul Cady, Paul J. Zech (argued), Felhaber, Larson, Fenlon & Vogt, Minneapolis, Minn., for respondent.

Before FLAUM, and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

RIPPLE, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order against So–White Freight Lines, Inc. For the following reasons, we enforce the order.

I

. BACKGROUND

In proceedings before the National Labor Relations Board (the Board), So–White Freight Lines (So–White) was found to have violated sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) and (a)(1),[1] by its suspension and later termination of truck driver William Warner. We present the facts as found by the Administrative Law Judge (ALJ).

So–White was established in 1986 to distribute the products of the So–White Chemical Company. So–White operated at a loss in 1986 ($54,143), 1987 ($265,318), and 1988

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Section 158(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this ti-

tle." Section 158(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

($394,699). In August 1988, the So–White Chemical Company lost a major contract with the Department of the Army. On September 1, 1988, So–White notified its employees that

> [a] management decision has been made to cut back on outbound loads for other shippers unless a profit can be anticipated. So–White Chemical will continue to be our principal customer.

> Over the next few weeks we will be reducing our operations. We plan to run our best trucks and drivers on an as needed, as available, basis. This will mean that some of the employees will be reduced to part time.

ALJ's Decision and Order, No. 30–CA–10381 at 2 (July 17, 1990).

In November 1988, So–White was faced with the renewal of the annual registration and licensing of its trucks at a cost of $18,000 per truck. It decided not to register some of its trucks and to reduce its staff. So–White laid off mechanics and a dispatcher and transferred another dispatcher to another company. It also made up a list ranking its fifteen truck drivers from best to worst. William Warner was placed at the bottom of the list and was laid off.[2]

The layoff list was made up by terminal manager Gary Maluka and dispatcher Ronald Eckes.[3] Criteria allegedly considered by them were efficiency, dependability, availability and flexibility in working weekends, attitude, safety, preparation and completion of paperwork, customer complaints, dispatcher complaints, and so on. They testified that Warner's position at the bottom of the list was due to poor performance. Specifically, they testified that Warner sometimes failed at the last minute to take scheduled loads and did not always finish trips on schedule, that customers complained about his clothing (sweatshirt with holes in it, cut-off blue jeans with holes in them), that Warner came late to a safety meeting and complained after the meeting was over, that Warner incurred excessive unloading charges, that Warner was said to drink, that Warner had refused a trip to Georgia for illogical reasons, that Warner had indicated he no longer wished to drive tankers carrying hazardous materials, that Warner lied to a dispatcher about his whereabouts, that empty beer cans were found in a truck driven by Warner and other drivers, that Warner hauled loads without shipping papers and hauled hazardous materials without the placards required by the Department of Transportation, that Warner delivered loads late and was late reporting to work approximately one Monday a month. In making up the list, Maluka and Eckes did not take into account the evaluations of the drivers in So–White's personnel records nor the safety and accident records of the drivers.

Now we turn to events in the months preceding Warner's layoff, March 1988 to November 1988. In early March, Warner mailed to his fellow drivers a list of concerns about working conditions and terms of employment. These concerns included wages, mileage, vacation pay, seniority, uniform allowance, sick days, pension plan and so forth. At the top of the page there was typed:

> The following is a list being sent to all So–White Freight Lines drivers, stating some of our concerns as employees of our company.

> As it is virtually impossible to have a meeting with everyone attending, letter form seems most appropriate.

> The following issues need to be attended to, the order of priority will vary and your comments will be greatly appreciated.

ALJ's Decision, App. A. At the bottom of the list was William Warner's name and address. Warner testified that about thir-

---

2. According to So–White, driver Robert Ward was scheduled to be laid off at the same time as Warner, but was injured on his last run and went on Worker's Compensation.

3. According to the testimony of So–White's president Thomas Teske, dispatcher Elaine Bottensek and Roger Teske, So–White's transportation manager and Thomas Teske's son, also participated in the decision that Warner was the worst driver. Tr. at 18. Thomas Teske testified that he himself was "aware" of the decision to put Warner last and "had no problems with it." Id.

teen or fourteen lists were returned to him with comments.

On March 24, Warner received a warning and a three-day suspension for having the smell of alcohol on his breath after returning from lunch. In the space provided on the warning for "EMPLOYEE REMARKS", Warner wrote, "the smell was not alcohol. We had two cans apiece of Kingsbury non-alcohol malt beverage with our lunch. Can obtain written statement to this fact. When tried to explain this to Diane [Sparks, the terminal manager], she hung up on me. Do not believe this warning justified." ALJ's Decision at 5. Warner testified that he presented Roger Teske with a can of the non-alcoholic beer and affidavits from the waitress and from another person at the pub where he had lunched, but that no one from the company talked to him about the incident before suspending him.

Thomas Bodzislaw, a truck driver on light duty work in So–White's office, testified that in late March or early April he was told to check Warner's logs for violations. He testified that Eckes said that Warner refused to enter his unloading hours in the off-duty section of the log, but entered them in the on-duty section. According to Bodzislaw, Warner's entries were proper.

At the end of March or the beginning of April, Warner asked terminal manager Diane Sparks to set up a meeting for him with Roger Teske to discuss the drivers' concerns. According to Warner, Sparks told him that Teske had seen a list of driver complaints written by Warner and that she and Teske had discussed it. Sparks herself also testified that she had given Teske the list of complaints and discussed the list with him. In his testimony, however, Teske denied seeing this list or letter or

anything like it. The ALJ did not credit Teske's denial.

Warner arranged a picnic on July 30, 1988, for So–White's drivers. He testified that he made copies of flyers announcing the picnic and put them on the drivers' clipboards and on the bulletin board. Although the flyers did not say anything about a union, Warner told the drivers the purpose of the picnic was to discuss joining a union. About eight drivers attended, and it was decided that Warner should contact a union. Tom Bodzislaw, then on light duty in So–White's office, testified that, at the time of the picnic, dispatcher Ronald Eckes said that Warner was "a pain —, causing trouble with the union" and that Warner "is trying to organize a union in here." ALJ's Decision at 7. In early August, Warner contacted a local of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO. He was told that the Teamsters were attempting to organize So-White Chemical and did not want to conduct an organization drive at both So-White Chemical and So–White. Warner testified that at some time after these events, while he was in the office waiting several hours for a load that was not ready when he was called in, he said to Eckes that "things would be better around here once the union is in." ALJ's Decision at 8.

On Saturday, September 26, 1988, Warner was suspended for three days for refusing a trip to Georgia. There was some conflicting testimony concerning the reasons for the suspension. In its brief, So-White claims that the reason for the suspension was Warner's failure to call in on time. It is not clear whether or not Warner called the dispatcher at the proper time on Friday afternoon,[4] or whether the 18.5

---

4. On the employee warning form, in the space for employee comments, Warner wrote that he had called in at 4:30 on Friday afternoon, as he had been instructed to do. Below, in a note to Thomas Teske, Roger Miller, who was handling weekend dispatch duties, wrote that Warner had not called in until 5:30. Before the ALJ, Warner testified that he couldn't remember what time he called in. Apparently there was no other testimony on this point.

The ALJ determined that Warner was disciplined for refusing to make the trip. We note that the testimony of terminal manager Gary Maluka supports this determination. Maluka gave the following version of the event:

Roger Miller had dispatched out Bill Warner to take a trip to Georgia. He had in affect [sic] refused it. I am not sure of the exact circumstances, whether there was something Sunday going on, or something, but he didn't

hours of driving time Warner had left that week (of the 70 hours allowed under DOT regulations) were sufficient for the trip to Georgia. Warner testified that, when requested to make the trip, he informed the dispatcher that he had not been hired for long hauls and that, under DOT regulations, he had worked too many hours that week to make a trip of that length. He also testified that he had turned down other long hauls and had never before been disciplined. The record contained evidence that other drivers had refused loads without punishment or with merely a warning.

Truck driver Linda Davis testified that, in October 1988, while performing light duty in So–White's office, she overheard a conversation between Maluka and Eckes in which one of them said that the Teskes "didn't like the idea of Bill starting a union, and they wanted to get him either to quit or something." ALJ's Decision at 9. She also testified that around the first of November she heard another conversation between Maluka and Eckes, in which they indicated that "they didn't like the idea of the union, that Bill was causing too much trouble, they wanted to get him to quit by giving him — loads and harassing him." *Id.* Tom Bodzislaw testified that during the fall of 1988, he heard Roger Teske tell Eckes to get rid of Warner since he, Roger Teske, was getting tired of "— around with him." *Id.* at 10. According to Bodzislaw, Maluka was present at the time.

Warner was laid off on November 28, 1988. Other drivers were laid off in January and February 1989.

## II

### THE BOARD PROCEEDINGS

After a hearing, the ALJ found that So–White had violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. The Board affirmed the ALJ's rulings, findings and conclusions, amended the ALJ's

remedy and modified his order. Because the Board's affirmance relied on an alternative ground put forth by the ALJ's opinion, and because So–White challenges the adequacy of the ALJ's analysis of that ground, we set forth the administrative proceedings in detail.

The ALJ found that, by circulating the list of concerns among the other drivers, by arranging the meeting/picnic of the drivers so that they could determine whether to seek union representation, by acting as the group's representative in trying to get a union to represent the drivers, and by trying to meet with Roger Teske to discuss the concerns of the drivers, Warner had engaged in activity protected by the NLRA. The ALJ also found that So–White knew of these activities.

The ALJ then examined the circumstances surrounding Warner's layoff, his suspension in September for refusing a load and his earlier suspension in March for having alcohol on his breath.[5] With regard to Warner's layoff, which resulted from his being placed last on the list of drivers, the ALJ found that

> there was no subjective or objective evaluation process engaged in by Maluka and Eckes regarding Warner. Eckes was told to get rid of Warner and that is exactly what occurred. Maluka and Eckes may have gone through the process regarding the remaining 14 drivers but Warner was not a part of the process.

ALJ's Decision and Order, No. 30–CA–10381 at 14 (July 17, 1990).

Regarding Warner's March suspension for having alcohol on his breath, the ALJ found "the fact that Sparks would not listen to Warner's explanation and Roger Teske, armed with an affidavit and the involved beverage, would not investigate the matter demonstrates ... that [So–White] was not interested in resolving the

---

want to leave as quickly. Hours were mentioned as a factor, but at the time of this discussion other things were brought up also. Reasons why he couldn't take it that did not hold water, or didn't seem logical or reasonable at the time.

Tr. at 287.

5. The March suspension was not one of the charged violations; however, evidence concerning it was presented as relevant background to the case.

matter on the basis of what was actually involved. There was no business justification for this suspension." *Id.* As for the suspension for refusing a load, again, the ALJ found that So–White "was not really interested in resolving a matter based on the merits." *Id.* at 15.

Thus, the ALJ concluded that the business reasons advanced by So–White for Warner's layoff and suspension were pretexts. So–White's real motivation was Warner's protected, concerted activities. The ALJ then added a brief alternative holding, with no elaboration or analysis:

> This is not a dual motive case under *Wright Line*, 251 NLRB 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), cert. denied 455 U.S. 989, [102 S.Ct. 1612, 71 L.Ed.2d 848], approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). If it were to be treated as a dual motive case, in my opinion the alleged business justifications advanced by Respondent do not demonstrate that absent Warner's concerted protected and union activities, he would have been suspended and subsequently laid off.

ALJ's Decision at 15.

The Board's Decision and Order affirmed the ALJ's rulings, findings and conclusions, but noted:

> We find it unnecessary to pass on the judge's finding that the reasons advanced by the Respondent for suspending and laying off Warner were pretextual. Instead, in finding that the Respondent has violated Sec. 8(a)(3) and (1) of the Act, we rely on the judge's finding that the Respondent failed to satisfy its burden under *Wright Line* to show that it would have suspended and laid off Warner even in the absence of his protected concerted and union activities.

Board's Decision and Order, No. 30–CA–10381 at 1 n. 2 (Jan. 18, 1991) (citations omitted). The Board also amended the remedy. The remedy fashioned by the ALJ provided that So–White "make [Warner] whole for any loss of pay he may have suffered as a result of the discrimination against him by payment to him of a sum of money equal to that which he would have earned as wages during the 3–day suspension and during the period from the date of his permanent layoff to the date on which Respondent offers reinstatement less net earnings, if any during said period." ALJ's Decision at 16. The Board amended the remedy by providing that So–White "is not precluded from the opportunity to show at the compliance stage of this proceeding that, had it not laid off Warner for unlawful reasons when it did so, it nevertheless would have laid him off for lawful reasons at a later date." Board's Decision at 2. This amendment of the remedy is not contested.

### III

### ANALYSIS

#### A. *Standard of Review*

We have jurisdiction to consider the Board's petition for enforcement under 29 U.S.C. § 160(e). Section 160(e) also provides our standard of review: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." Under this standard, the Board's findings "are entitled to respect." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). A reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Id.* at 488, 71 S.Ct. at 465. The Board's application of the law to particular facts is also reviewed under the substantial evidence standard, *Indianapolis Power & Light Co. v. NLRB*, 898 F.2d 524, 529 (7th Cir.1990), and this standard "is not modified in any way when the Board and the ALJ disagree as to legal issues or derivative inferences made from the testimony." *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314 (7th Cir.1991) (citing *Weather Shield Mfg., Inc. v. NLRB*, 890 F.2d 52, 57 (7th Cir.1989)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). It is the independent validity of the Board's order that is under review. *Id.*

Despite the deference with which we review the Board's decisions, a reviewing court is "not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465. "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds." *Id.* at 490, 71 S.Ct. at 466. Thus, we have the expectation that the NLRB will give reasoned decisions so that we can discern how the record supports its judgment.

## B. *Application*

In *Wright Line*, 251 N.L.R.B. 1083, 1083 (1980), approved by *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Board formally set forth a "test of causation" to be used in analyzing the "relationship between the employees' protected activities and actions on the part of their employer which detrimentally affect their employment." Under the *Wright Line* test, the General Counsel is required to make a *"prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Wright Line*, 251 N.L.R.B. at 1089. To make a prima facie showing, the General Counsel "carries the burden of showing by a preponderance of the evidence that the employer's action was motivated in any

way by a desire to impede protected concerted activity." *NLRB v. Advance Transp. Co.*, 965 F.2d 186, 190 (7th Cir. May 22, 1992). Once this is established, "the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Wright Line*, 251 N.L.R.B. at 1089. The employer must make this showing by a preponderance of the evidence. *Advance Transp.*, 965 F.2d at 190; *see also Holo–Krome Co. v. NLRB*, 954 F.2d 108, 111–12 (2d Cir.1992).

While "pretext analysis" and "dual motive analysis" are obviously different, the fact-finding methodologies of each are similar and, indeed, overlapping. Here, although the ALJ stated that this was not a "dual motive" case under *Wright Line*, his analysis followed the methodology established by *Wright Line*.[6] He examined first the evidence that protected conduct was a motivating factor in So–White's decision to fire Warner. Having concluded that it was, the ALJ then examined the evidence put forward by So–White to show that the same action would have taken place for legitimate business reasons. He concluded that the reasons alleged by So–White were pretextual. The Board agreed with the ALJ's conclusion that protected conduct was a motivating factor in placing Warner last on the layoff list. Rather than concluding that So–White's proffered business reasons were mere pretexts, the Board preferred to conclude, as the ALJ had suggested was possible, only that the company had not carried its burden of showing that the firing would have taken place in the absence of the protected conduct.

**6.** *See Holo–Krome Co. v. NLRB*, 954 F.2d 108, 111 (2d Cir.1992) ("Though the two forms of analysis are different, it is possible to analyze all motivation cases, as the Board prefers, using only the dual motivation approach."). *Cf. NLRB v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1136 (7th Cir.1983), in which the ALJ concluded that *Wright Line* analysis did not apply because the sole motive for the layoffs was anti-union animus. There, "we [were] persuaded that the Board correctly held that ALJ's analysis conformed to the *Wright Line* analysis: once the General Counsel made a prima facie case, the company attempted to meet its burden of per-

suasion of contending that the layoffs were imposed for business reasons, but the ALJ held that these were not the real reasons for the layoffs." *See also Artra Group, Inc. v. NLRB*, 730 F.2d 586, 591–92 (10th Cir.1984) (upholding Board where Board's analysis followed *Wright Line* even though it did not mention *Wright Line*); *Republic Die and Tool Co. v. NLRB*, 680 F.2d 463, 465 (6th Cir.1982) (ALJ's finding that employer's alleged legitimate reasons for discharging employee were purely pretextual meant that employer failed its burden under *Wright Line* of rebutting "prima facie" case made out by General Counsel).

Now we turn to So–White's contentions (1) that there is no substantial evidence to support a prima facie case that Warner's concerted protected activities were a motivating cause in his suspension and layoff and (2) that, even if the Board was correct in determining that a prima facie case had been made, substantial evidence does not support the determination that So–White failed to meet its burden of showing that it would have suspended Warner and laid him off even in the absence of protected activities.

■. With respect to the General Counsel's prima facie case, So–White contends that there was very little evidence that Warner engaged in protected activities and no evidence that So–White's management knew of such activities. It argues that the ALJ's finding that So–White knew of the protected activities was based on an unfounded inference from dispatcher Ronald Eckes' failure to deny at the hearing that Warner told him that "things will be better around here when the Union comes in." From this failure, argues So–White, the ALJ inferred that Eckes knew of Warner's activities and then improperly attributed that knowledge to other members of So–White's management.

This argument overlooks the evidence of one of So–White's own witnesses, Diane Sparks, who, as the ALJ noted, testified that she showed Roger Teske the list of concerns drafted by Warner and that she discussed the list with Teske. The circulation of this list was, as the ALJ correctly determined, a concerted, protected activity. The ALJ did not credit Roger Teske's conflicting testimony that he had not seen the list at the time of Warner's first suspension. The ALJ also noted the comment written by Warner on his September suspension notice that he felt that he was "being harassed by company ... [because of] my attempt to listen to drivers problems and relate them to management." Also written on the notice was a note from dispatcher Roger Miller to So–White's president Tom Teske, so presumably the notice, with Warner's reference to his protected

activities, was seen by Tom Teske, if not also by Roger Teske.

Moreover, the ALJ's finding that Eckes knew of Warner's protected activities was not based solely on his failure to deny hearing Warner's comment about a union; the ALJ pointed to Tom Bodzislaw's testimony that he overheard Eckes himself saying that Warner was "a pain —, causing trouble with the union ... [he] is trying to organize a union here." Noting Bodzislaw's forthright demeanor, the ALJ specifically credited his testimony on this point. The ALJ also credited testimony by Linda Davis that Eckes had a conversation in mid-October 1988 with Maluka during which it was stated that the Teskes "didn't like the idea of ... [Warner's] starting a union" and that in early November she overheard Maluka and Eckes again discussing Warner, his union activities and their desire to get rid of him by "harassing him and giving him — loads." Moreover, the testimony of Bodzislaw and Davis, credited by the ALJ, supports the conclusion that So–White not only knew of Warner's protected activities, but was hostile to them.

■ The ALJ found credible the evidence we have just summarized and relied on it in determining that So–White knew of Warner's protected activities. Credibility is "a function not only of what a witness says but of how a witness says it, and the cold record before this court is a poor medium for conveying anything other than a witness's exact words." *NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 819 (7th Cir.1991). Therefore, "credibility determinations are to be made by the ALJ and the Board and will not be overturned by a reviewing court absent extraordinary circumstances." *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1477 (7th Cir.1992) (quoting *NLRB v. Illinois–American Water Co.*, 933 F.2d 1368, 1374 (7th Cir.1991)). Extraordinary circumstances include a clear showing of bias by the ALJ or the ALJ's discrediting of uncontroverted sworn testimony. *Illinois–American Water Co.*, 933 F.2d at 1374. In the present case the ALJ was confronted with conflicting testimony; he neither rejected uncontroverted

testimony nor accepted inherently unbelievable testimony. Although So–White claims that the ALJ was biased,[7] we see no basis for this claim. Under the standards we have set forth, we have no grounds for disturbing the ALJ's credibility determinations.

The ALJ also determined that there was a nexus between Warner's protected activities and So–White's suspension and later firing of Warner. "Direct and uncontroverted evidence of an anti-union animus" is not required to uphold such a finding. *NLRB v. Bliss & Laughlin Steel Co.,* 754 F.2d 229, 235 (7th Cir.1985). An employer's "motivation is a question of fact to be determined by the Board from consideration of all the evidence and in making this determination the Board is free to rely on circumstantial, as well as direct evidence." *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 626 (7th Cir.1981). As with other factual findings made by the Board, the Board's conclusion that an employer acted with a discriminatory motive is conclusive if supported by substantial evidence. *See U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1315 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992).

The conclusion that Warner's protected activities motivated So–White's conduct is supported by substantial evidence. In regard to the first suspension, which took place soon after Warner circulated the list of concerns among the drivers,[8] the ALJ concluded that neither Diane Sparks nor Roger Teske had any interest in investigating the matter or resolving it on the facts. Sparks hung up on Warner when he attempted to explain that he had been drinking only a non-alcoholic beer-like beverage, and Teske, although presented with affidavits and a can of the beverage Warner had been drinking, went ahead with the suspension. The ALJ was justified in concluding that the suspension was motivated by Warner's protected activities. In regard to the second suspension, the ALJ concluded that So–White

did not demonstrate that it ever meted out so severe a punishment in circumstances similar to those at hand. The record contains evidence that another driver received a warning for refusing a load. And at least one other driver, Davis, was not punished for refusing a load when she did not have enough hours. Warner explained that he did not have enough hours. It is questionable whether the 18.5 hours Warner had left in driving time would have been sufficient to deliver the perishable load on time. The warning speaks to "[r]efusing to leave So–White in time to make the delivery." Yet what really was involved was how much driving time Warner had left. Warner testified that the dispatcher did not have any way of knowing how many hours, he, Warner, had left in his 70-hour week and that no one called him to talk to him about this before the suspension was issued. In other words, once again Respondent was not really interested in resolving a matter based on the merits.

ALJ's Decision at 15. Although So–White in its brief asserts that the suspension was based on Warner's failure to call the dispatcher on time on Friday in combination with prior performance problems, the facts as found by the ALJ and his conclusion that the suspension was motivated by Warner's protected activities are supported by substantial evidence, in particular evidence that other drivers refusing loads had received either no disciplinary action or more lenient disciplinary action. *See NLRB v. P*I*E Nationwide, Inc.,* 923 F.2d 506, 516 (7th Cir.1991) (citing *NLRB v. Transp. Transfer & Storage Co.,* 678 F.2d 679, 687 (7th Cir.1982).

---

**7.** So–White complains that the ALJ "completely disregarded the sworn testimony of each of Respondent's witnesses" and that he "found more compelling the testimony of Mr. Bodzislaw and Ms. Davis." Respondent's Br. at 30–31 n. 4. But, "[b]ias is not conclusively established merely because an ALJ uniformly credits one party's witnesses over another's." *NLRB v. Berger*

**8.** *See NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 626 (7th Cir.1981) (coincidence in time between employees' union activity and adverse action by employer is evidence of discriminatory motive).

*Management Corp.*, 462 U.S. 393, 404, 103 S.Ct. 2469, 2476, 76 L.Ed.2d 667 (1983)). Thus, even if the evidence could support a different conclusion, we may not displace the conclusions reached by the ALJ. The ALJ determined that So–White's November layoff of Warner also was motivated by Warner's protected activities. The ALJ concluded that, in placing Warner at the bottom of the list of drivers, Maluka and Eckes engaged in no subjective or objective evaluation process, but merely followed Roger Teske's instructions to get rid of him.

 So–White also asserts that it met its burden to demonstrate that it would have suspended Warner and fired him even in the absence of his protected activities. So–White points to the undisputed evidence that it had substantial losses and that its decision to fire Warner was made as part of a drastic reduction in operations. So–White argues that, although the ALJ acknowledged the losses and the reduction of operations, he did not address them in his analysis. In addition, So–White claims that its decision to place Warner last in its list of drivers was based on Warner's job performance.

We cannot agree with So–White that substantial evidence is lacking to support the Board's conclusion that So–White failed to show that it would have taken the actions complained of even in the absence of Warner's protected activities. Although So–White had legitimate economic reasons to reduce its work force, those reasons do not explain why it decided that Warner would be first to be laid off and would not be recalled. Maluka and Eckes' admitted failure to consider personnel records and accident records in making up the layoff list is substantial evidence to support the ALJ's conclusion. Also, as the ALJ pointed out in his finding of facts, many of the asserted

deficiencies in Warner's performance that Maluka and Eckes testified they relied on in putting Warner at the bottom of the list were undocumented.[9] Moreover, Warner's layoff was preceded by two suspensions which the ALJ determined were motivated by Warner's protected activities. The ALJ was justified in not accepting So–White's proffered explanations. *See NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 692 (7th Cir.1982) ("an employer's explanation need not be accepted if there is a reasonable basis for believing the explanation is a pretext for the retaliatory action"). The gap of time between the spring and summer protected activities and the November layoff does not demonstrate that there is no connection between the two, as So–White claims. The ALJ had before him evidence that the hostility aroused in So–White by Warner's activities had not abated: the September suspension, and anti-union and anti-Warner comments made by Maluka, Eckes, and Teske throughout the fall.

### Conclusion

The findings of fact of the Board are supported by substantial evidence on the record considered as a whole. The Board's application of the law to those facts contains no error. Accordingly, we grant enforcement of the Board's order.

Enforced.

---

9. For example, Warner was said to have told a dispatcher he was in Madison, when he was just a few minutes away from So–White. So–White's witnesses could not explain why the incident was undocumented and why it resulted in no disciplinary action. So–White alleged that it had received customer complaints, and Thomas Teske testified that documentation probably existed, but no documentation was produced at the hearing. Thomas Teske also testified that Warner's employee data calendar had a place for marking lateness, but no late days were marked on Warner's calendar. Nor, apparently, was any action ever taken regarding the beer cans found in a truck driven by Warner and others, even though Eckes mentioned the incident in testifying as to the reasons for Warner's layoff.