**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALMET, INCORPORATED, Respondent.**

**No. 92–1468.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1992.

Decided March 3, 1993.

Robert J. Englehart (argued), N.L.R.B., Contempt Litigation Branch; Aileen A. Armstrong, Collis Suzanne Stocking, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC; and William T. Little, N.L.R.B., Region 25, Indianapolis, IN, for petitioner.

John T. Menzie (argued) and Scott Hall, Gallucci, Hopkins & Theisen, Fort Wayne, IN, for respondent.

Before CUMMINGS and MANION, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

The National Labor Relations Board ("Board") seeks enforcement of its order concerning unfair labor practice charges against Almet, Inc. ("Almet") resulting from an organizing campaign by the United Steelworkers of America ("Union") at Almet's steel production plant. The Board's decision finds several violations of section 8(a) of the National Labor Relations Act, 29 U.S.C. § 158, and orders a second union representation election. For the reasons given below, we grant the Board's application for enforcement.

## I. BACKGROUND [1]

Almet operates a steel production plant in New Haven, Indiana, which makes primarily building steel in a job-shop-oriented plant with approximately fifty production employees. Almet is owned by three shareholders; Richard Greim, the majority shareholder, Robert Winkeljohn, plant superintendent and senior vice president, and Jack Wickliffe, president. All three have daily contact with the employees.

The effort to organize production employees at Almet began in October 1987 when certain interested employees decided to contact the Union for help with a campaign. On November 2, 1987, a Union representative held a meeting with employees interested in Union representation, including Frank Sutton, Jeffrey Putt, and several others, and passed out union cards for those present and extra cards for others at the plant.[2] These cards were returned to

---

**1.** This presentation of the facts is based upon the administrative law judge's findings of facts and the Board's subsequent adoption of them with slight modification. Our review of the record leads us to conclude that we must affirm these findings. Where a relevant conflict exists between these findings and Almet's contentions, we note it.

**2.** The administrative law judge found that 27 cards were signed, but the Board did not determine whether the majority of the employees favored the Union according to the cards nor

the Union representative at the second Union meeting.

Winkeljohn, the plant superintendent and senior vice president, testified at the administrative hearing that by November 9, 1987, he had knowledge of organizing activities at the plant based upon employees' comments, writing on the bathroom walls, or "scuttlebutt" as he called it. The Union filed a petition on November 10 requesting that the Board certify the Union as the exclusive representative of the production employees. Almet received notice of the petition from the Union on November 12 and claims this is when it first had notice of union organizing. The Board, however, adopted the administrative law judge's ("ALJ") finding that the managers of Almet had notice of union activity by November 9 based upon Winkeljohn's testimony. The ALJ further credited management with knowing the names of the organizers at that time.

The first, chronologically, unfair labor practice charge concerned the night shift employee Frank Sutton, one of the original organizers at Almet. Sutton was ordered to take a drug test, suspended from work for three days while awaiting the results, and received a disciplinary warning because of two incidents at work on November 9, 1987. After sifting through contradictory evidence and testimony of several witnesses, the ALJ found that Sutton did skip two to four steps while on a beam which was part of a transverse conveyor system, later that same day, Sutton did drive a forty-ton forklift into the plant at a "slightly excessive" speed. According to Greim and Winkeljohn, these two incidents were so bizarre and unusual that they suspected Sutton of drug use. Additionally, because Sutton's name was linked to an employee at Almet who had been arrested the month before on drug charges (and had told the police that the drug had been processed at Almet), Almet claims it had another basis for suspecting Sutton of using drugs at work on November 9.

The ALJ, however, agreed with the General Counsel and found that Almet used the drug test, three-day suspension, and warning to harass Sutton, a known union organizer in violation of section 8(a)(3) of the National Labor Relations Act ("Act"). The ALJ found that Almet's drug use suspicion was a pretext, neither of these incidents was as serious or unsafe as Almet claimed, and therefore the company had violated the Act. The ALJ deducted that if the incidents had really been as serious as Almet claims, someone would have cautioned Sutton at the time of the incidents since either Greim or Winkeljohn observed the incidents.

A second violation of the Act found by the ALJ, and adopted by the Board, concerned Almet's general foreman's solicitation of employee Jeffrey Putt to quit his job and threat to discharge him because of his pro-union activity. On November 13, 1987, Howard Spencer, the general foreman, called Putt into his office to discuss complaints by other employees about Putt's comments "degrading the company" and any employee who is happy with the present situation at Almet. Earlier that day, Spencer had written a note for Putt's file stating that in the last couple of weeks, employees had complained about Putt. Spencer wrote, in part, that "Jeff is not an asset to this company with his behavior and attitude toward his fellow employees and to the company." (ALJ's Decision, Sept. 21, 1989, at 8.) The ALJ concluded that this note showed Spencer's knowledge and concern about Putt's union activity and the possibility of disciplinary action if it continued. Spencer told Putt in his office: "If you are unhappy with your job, why don't you go find another job; seek employment elsewhere? If it were me, and I had to go to work every day and be that miserable, I'd go out and find another job." (Id.) Spencer further said to Putt that he had a second reason to fire him. Spencer then said: "I can fire you. I think I will fire you. But I'll tell you what. I'll give you one more chance, but one more screw up;

whether certain disputed cards were validly signed. The cards are not at issue since the Board ordered a second election as the appropriate remedy for the unfair labor practice charges instead of a bargaining order.

one more complaint and you're history."
(*Id.*) The ALJ found, and the Board affirmed, that Spencer solicited Putt to quit his job and threatened him with discharge in order to dissuade him from continuing his pro-union campaign in violation of section 8(a)(1) of the Act.

Two other violations of section 8(a)(1) occurred on November 13 and 17, 1987, according to the Board, when Greim and Winkeljohn spoke to the production employees. Greim gave a speech to the employees on November 13 in which he said:

> You all know what kind of man I am and what I stand for. You also know how I feel about the unions. I have never lied to you before, and I'm not going to start now. As I stand here before you I'm here to tell you that I will never agree to any demands that I believe are not in the best interest of this company—and if I have to shut down this plant to maintain those principles—I will shut it down and go out of business.

(Board's Decision, Order, and Direction of Second Election, Nov. 20, 1991, at 3.) The ALJ found this speech protected under section 8(c) of the Act, but the Board disagreed and found that Greim threatened the employees with retaliation if they voted for union representation. The Board concluded this threat of plant closure violated the Act.

Winkeljohn gave the second speech at issue on November 17, 1987, to the production employees. Winkeljohn said:

> It has come to my attention that certain Almet employees are being bullied and threatened by other employees on company premises. I will not tolerate these activities.
>
> I refuse to stand by while any of my employees are subjected to goon tactics carried on by gangsters in an attempt to coerce other employees into doing anything they do not wish to do. I have not and will not ever allow this to occur at Almet.
>
> From here on out, if I become aware of any employees using gangster tactics to bully or intimidate other Almet employees for any reason, I will discipline that employee appropriately, up to and including discharge if warranted. This applies to all Almet employees. That means you, you, and you.
>
> Also, if I become aware that any of my employees are bullied or threatened by these goon tactics and they do not report the occurrences to me, I will discipline those employees for not reporting what happened to them.

(ALJ's Decision, Sept. 21, 1989, at 10–11.) The ALJ found that this speech was not prompted by any legitimate fear of coercive tactics by pro-union employees. But the ALJ did not believe the testimony of Putt that each time Winkeljohn said "you," he pointed at a union supporter and then further blamed the supporters for putting people's jobs on the line. (This additional statement alleged by Putt is not in the copy of the speech in the record.) Therefore, the ALJ did not find that this speech violated the Act. The Board disagreed, however, and found that a different part of the speech did violate the Act with its unlawful threat of punishment for failure to report "goon tactics." The Board found that the speech was a response to union activity and coercive solicitation at Almet.

A second plant closure threat to employee Sutton on November 16, 1987, by Greim was also held to have violated section 8(a)(1) of the Act. On Sutton's first day back at work after his unlawful three-day suspension, when it was raining and sleeting, he was ordered to move a woodpile to a place and then back to where it had been. The ALJ found this work assignment to be a continuation of the pattern of harassment against Sutton. Sutton then had to dig a ditch outside. Greim talked to Sutton while he was digging and said, "what I said to you two years ago still goes." Sutton testified that this was a reference to another union campaign at Almet two years ago in which he had been involved. Two years ago, Sutton claims that Greim told him after a union election in which the union lost that he, Greim, would never go through this type of thing again. Greim, after reiterating his threat from 1985, then told Sutton, using obscenities, that he had

the power to do whatever he wanted with the company, and that he could probably rent out the company buildings and get more money per square foot without going through all these problems with Sutton and others. Continuing his use of obscenities, Greim stated that he was tired of all the union problems. The ALJ found, and the Board adopted the finding, that this plant closure threat was made for the illegal purpose of interfering with Sutton's pro-union activities.

An election for union representation was held on January 21, 1988. Eighteen votes were cast for the Union and thirty against the Union, with three votes non-determinative. The ALJ found that because of the severity of the unfair labor practices discussed above, the election should be set aside, and the ALJ recommended that a new election be held. The Board agreed with the ALJ that a bargaining order was not necessary although a new election was.

The order which the Board seeks to enforce requires Almet, in relevant part, to cease and desist from threatening, disciplining, or suspending employees in order to discourage protected union activities. In addition, to pay Sutton for any loss he may have suffered as a result of the suspension and to expunge any warnings in Sutton's or Putt's files. Further, the union representation election is set aside by the Board, and a new one is directed.

## II. STANDARD OF REVIEW

■ When reviewing an application for enforcement of an order of the Board, we are limited by statute in our review. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *National By–Products, Inc. v. NLRB*, 931 F.2d 445, 451 (7th Cir.1991). When considering the substantiality of the evidence, we may take into account the evidence in the record weighing against the findings. *Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). We may not, however, substitute our judgment for the Board's when two conflicting views are present, and we would have justifiably come to a different conclusion if reviewing de novo. *Id.* Moreover, the Board's application of law to the particular facts of the case is also entitled to this deferential standard of review. *NLRB v. Advance Transp. Co.*, 979 F.2d 569, 573 (7th Cir.1992); *NLRB v. So–White Freight Lines, Inc.*, 969 F.2d 401, 405 (7th Cir.1992).

## III. ANALYSIS

Almet was charged with violating sections 8(a)(1) and (3) of the National Labor Relations Act. Section 7 of the Act gives employees the right "to self-organization, to form, join, or assist labor organizations." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice by an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." 29 U.S.C. § 158(a)(1). Section 8(a)(3) states it is also an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

### A. Drug Testing, Suspension, and Disciplining of Sutton

■ Almet violated sections 8(a)(1) and (3) of the Act when it conditioned Sutton's employment on his submission to a drug test, suspended Sutton for three days, and gave him a disciplinary warning because of two incidents occurring on November 9, 1987. The ALJ found that Almet had knowledge of Sutton's union activities by November 9 when the incidents occurred. The ALJ also found that both complained of incidents were trivial and did not justify Almet's actions. The ALJ therefore concluded that Almet treated Sutton the way it did as part of "a transparent ploy to harass Sutton, a known or suspected union organizer, in an attempt to show that [Almet] was capable of manufacturing pretexts to

rid itself of union activists such as [Sutton], and to dissuade him from continuing his organizational activities." The Board adopted the ALJ's findings and conclusion.

Substantial evidence in the record supports the ALJ's finding that Almet, or Greim and Winkeljohn, had notice of Sutton's efforts on behalf of the Union. Winkeljohn admitted that by November 9, 1987, he had heard rumors or "scuttlebutt" that an organizing campaign was underway at the plant. The record reflects that it was common knowledge among the employees which employees were working for union representation, and that some employees may have told members of management who they were. There was also testimony that the night shift was eliminated as of November 9 because of the number of union organizers working that shift, including Sutton. Furthermore, Sutton was a known union organizer in the union campaign of 1985 at Almet.

What exactly Sutton did on top of the beam on November 9, 1987, whether he skipped or hopped is only important if it was a legitimate basis, along with the forklift episode, for Almet's actions taken against Sutton. *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400–01, 103 S.Ct. 2469, 2473–74, 76 L.Ed.2d 667 (1983); *Northern Wire Corp. v. NLRB*, 887 F.2d 1313, 1318 (7th Cir.1989). Even if we believe that both of these episodes qualified as unsafe behavior, we cannot say that the ALJ was wrong, and the Board accepted his finding, in concluding the incidents were trivial and did not warrant the response they caused. The ALJ strongly objected to Almet's claim that Sutton's behavior was "bizarre" and stated that "[t]here are almost 300 volumes of Board cases, each volume containing descriptions of incidents of horseplay far more bizarre than the two incidents in which Sutton had engaged." The ALJ's experience in this area is convincing, as well as the fact that never before had Almet required an employee to take a drug test (not even the employee who was arrested on drug charges in October 1987 though discharged in December 1987). *See So–White Freight Lines, Inc.*, 969 F.2d at

408. Nor had Almet similarly disciplined or suspended any other employee for equally reckless or careless behavior. *See Advance Transp. Co.*, 979 F.2d at 574–75. Furthermore, Almet cannot escape the logical argument that if Sutton's behavior was so unsafe, why was he not cautioned at the time when he skipped or drove too fast? Either Greim or Winkeljohn observed the incidents, and yet neither of them felt compelled to do or say anything to Sutton when he acted.

## B. Threats to Putt

Section 8(a)(1) makes it an unfair labor practice by an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." 29 U.S.C. § 158(a)(1). When Spencer, the general foreman, summoned employee Putt to his office to discuss other employees' complaints about Putt, he threatened him with discharge and solicited him to quit his job in order to convince him to stop his pro-union activities. "The test of interference with the right of self-organization is not whether an attempt at coercion has succeeded or failed, but whether the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their section 7 rights." *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 689 (7th Cir.1982). Here, although Spencer never said the word union or any other similar word, it is clear from the record that Putt would be justified in believing that Spencer was speaking of Putt's activities on behalf of the Union when discussing employees' complaints and Putt's poor attitude toward the company. *NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 819 (7th Cir.1991); *see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). This constitutes an unlawful interference with Putt's right to self-organization. Almet argues that Spencer was simply concerned that Putt was provoking fights with other employees. But except for Spencer's testimony, there is no other credible support in the record for this argument; the ALJ's find-

ing therefore, and subsequently the Board's, that Spencer was motivated by Putt's union activity is entitled to our statutorily mandated deference. *Universal Camera Corp.*, 340 U.S. at 490, 71 S.Ct. at 466.

### C. Greim's Speech on November 13, 1987

The Board reversed the ALJ's determination that Greim's speech given on November 13, 1987, was protected under section 8(c) of the Act which allows the "expressing of any views, arguments, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form ... if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The Board found that Greim's statement that he would close the plant was a threat of retaliation if the Union was selected by the employees.

Our standard of review is no different when the Board and the ALJ disagree on legal issues or derivative inferences from testimony. *So–White Freight Lines, Inc.*, 969 F.2d at 405. We are reviewing the Board's order, although the ALJ's findings are a part of the record. *NLRB v. P\*I\*E\* Nationwide, Inc.*, 923 F.2d 506, 513 n. 7 (7th Cir.1991).

■ While an employer has a right to express his or her views on unionization and the probable consequences of it, employees have the right to organize without any threats of retaliation from their employer. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). These rights are in tension, particularly because case law shows the fine line distinguishing proper remarks by an employer and illegal ones. *Wiljef Transp., Inc. v. NLRB*, 946 F.2d 1308, 1310 (7th Cir.1991); *see NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1369 (7th Cir.1983). The test is whether the employer's remarks are based on objective facts and predictions of economic consequences of unionization. *Gissel Packing Co.*, 395 U.S. at 618, 89 S.Ct. at 1942; *Village IX, Inc.*, 723 F.2d at 1367. But "[i]f there is any implication that an employer may or may not take action solely on his own initia-

tive for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion." *Gissel Packing Co.*, 395 U.S. at 618, 89 S.Ct. at 1942.

■ We agree with the Board that Greim's statement that he would shut down the plant in order to maintain his principles was an unfair labor practice because it interfered with the employees' right to self-organize. Greim spoke to the assembled group of employees the day after the company received official notice of the petition filed by the Union. He gave no indication of what was in the "best interest" of the company if a union was not, nor why he would have to close the plant to "maintain" his "principles." Greim made no attempt to explain his opinion and prediction, and his speech is easily defined as a not too subtle threat to the employees at Almet of what he will do if the Union succeeds. *Village IX, Inc.*, 723 F.2d at 1368; *Berger Transfer & Storage Co.*, 678 F.2d at 691.

### D. Winkeljohn's Speech on November 17, 1987

■ An employer may not threaten to discipline employees for not reporting union activity which is subjectively offensive without regard to whether that activity is protected organizational activity. *Hawkins–Hawkins Co., Inc.*, 289 NLRB 1423, 1424 (1988). When an employer requires employees to report if they have been harassed or threatened by union supporters, this tends to discourage employees from engaging in protected union activity in violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). *Ballou Brick Co. v. NLRB*, 798 F.2d 339, 346 (8th Cir.1986).

■ The Board found that when Winkeljohn stated: "If I become aware that any of my employees are bullied or threatened by these goon tactics and they do not report the occurrences to me, I will discipline those employees for not reporting what happened to them," he violated section

 

8(a)(1) of the Act. The Board found that such a statement has the dual effect of encouraging employees to identify union supporters as well as discouraging employees from exercising their rights to organization.

We agree with the Board that Winkeljohn illegally threatened to discipline employees if they failed to report any "goon tactics." The Board found, and substantial evidence in the record supports this finding, that Winkeljohn was speaking of union solicitation when he spoke of "goon" and "gangster" tactics. Almet claims that Winkeljohn called the meeting because production levels were dropping at the plant, and Winkeljohn simply wanted to "get production back on track." But Winkeljohn admitted at the administrative hearing that when he spoke of goon tactics, he was referring to efforts to have union cards signed. It is all too clear that his speech was another illegal attempt to interfere with the employees' union campaign.

■ Almet argues that the Union's complaint did not allege that this speech was illegal because it encouraged employees to report when they were pressured by union supporters. According to Almet, the Union only alleged an unfair labor practice based upon Winkeljohn's pointing to specific union supporters while speaking. Thus Almet believes it was denied due process as a result of the Board's decision because the reporting issue was not fully litigated at the hearing level. The ALJ identified this argument in its decision when he found the speech legal on the supposed pointing basis. The Board did not accept the ALJ's conclusion and found the speech was an unfair labor practice without discussion of the sufficiency of the Union's allegations in its complaint.

■ Adequacy of notice is an essential prerequisite to fair and effective adjudication. *NLRB v. Complas Indus., Inc.*, 714 F.2d 729, 733 (7th Cir.1983). But we believe the complaint did give Almet sufficient notice to satisfy due process requirements. The Union alleged in its complaint: "On or about November 17, 1987, [Almet], acting through Robert Winkeljohn, at the facility, threatened its employees with loss of jobs and other unspecified reprisals because they supported the Union." Thus Almet had sufficient notice that Winkeljohn's speech on November 17 was at issue, and the entire speech was in the record. Moreover, in its exceptions to the ALJ's decision, Almet argued, without any mention of a due process violation, that Winkeljohn's statement legally encouraged employees to report if they were threatened without discouraging pro-union activities. *See NLRB v. George Koch Sons, Inc.*, 950 F.2d 1324, 1336 (7th Cir.1991).

## IV. CONCLUSION

The Board's factual findings are supported by substantial evidence in the record. The Board correctly applied the law to these facts, and we grant its application to enforce its order.

ENFORCED.